## Wm. H. Gilliam, Exr., etc., *v.* Wm. T. Brown.

1. Empanelling Jury—Duty of the Court—Discretion.—It is the duty of the court to so watch over the empanelling of the jury as to preserve its purity and impartiality. Nothing should interfere with the performance of this duty but the right of the parties to challenge, peremptorily or for cause. Large discretion to the court for this purpose is always indulged, limited only by the requirement that the court shall keep within the pale of the law.

2. Challenge—Verdict.—Although it appear that the court refused to sustain a challenge to a juror for cause well taken, and he was excluded afterward by the peremptory challenge of the party, or that a juror was set aside by peremptory challenge, who should have been set aside for cause, yet the verdict will be sustained.

3. Setting Aside Jurors.—The setting aside of a juror, unchallenged by either party, 9 S. & M., 115, or discharging from the panel, a juror who has been sworn and taken his seat, on discovery, before testimony introduced, that he is incompetent to serve, 32 Miss., 389, 37, Miss., 376, does not deprive the party of a legal right, and may and ought to be done by the court in a proper case, in order to secure an impartial jury.

4. Will—Construction—Parol Testimony.—Parol testimony of the declaration of the testator at the time his will was written, is not admissible to supply or contradict, enlarge or vary the words of a will, nor to explain the intention of the testator, except to explain a latent ambiguity, or to rebut a trust. Kent; 1 Johns. Ch. R., 233 ; 40 Miss., 755 ; 41 Miss., 25.

5. Same.—While courts have been slow to receive testimony *aliunde*, they have seized upon slight circumstances appearing on the face of the will, to repel the presumption that a bequest or legacy to a debtor was intended to be in payment and discharge of the debt and not a gift ; such as the express declaration in the will that all debts must be paid ; or that the legacy is payable upon a contingency, or is less beneficial than the debt ; or is payable at a future date ; or that the debt is unliquidated. 1 P. Williams, 409 ; Toller Exrs., 336 ; 4 Wend., 443 ; 3 Atk., 68–96 ; 5 Owen, 370 ; 2 Gill. & J., 185 ; 12 Mass., 391 ; 2 Hill, 576.

6. Intention of Testator.—If it appear from the language of the will, or by evidence *aliunde*, that the legacy was intended by the testator as a satisfaction; it will so have effect. 6 Cow., 246 ; 2 Edw. Ch. R., 387 ; 1 Greenl. Ch. R., 1 ; 2 Hill, 576 ; 12 Wend., 65 ; 6 Paw., 18.

7. Debtor's Claim—Uncertainty—Presumption.—Where the claim of the legatee is for a sum unliquidated and uncertain in amount, requiring testimony to ascertain

what is owing, or where it may be payable in a different currency from the legacy, or largely exceeds the amount of the legacy, which was to be paid promptly in gold; the presumption of a payment, instead of a gift, does not arise.

8. ATTORNEY'S ADVICE—INADMISSIBLE IN EVIDENCE.—Where a party, supposing he has a valid claim against another, consults his attorney upon the subject, and is advised that his evidence will not be sufficient to establish it, and under that impression, admits to the other that he has no claim against him, but subsequently brings suit to enforce the demand, the testimony of the attorney as to the advice given, is inadmissible on the trial to explain the motives that induce his admission of no claim against defendant. Such disclaimer is no legal bar, however, to his action.

9. ILLEGAL CONTRACT—NEW CONSIDERATION.—It is a general principle that if the contract grows out of an illegal act, a court of justice will not enforce it. But if the promise be unconnected with the illegal act, and is founded on a new consideration, it is not tainted by the act. A new contract resting on a new consideration, although in relation to property, respecting which there had been unlawful transactions between the parties, is not of itself necessarily unlawful.

10. ILLEGALITY OF EXECUTED CONTRACT NO DEFENSE.—It is well settled that after the illegal contract has been executed, one party in possession of all the gains and profits resulting from the illicit trafic and transactions, will not be tolerated to interpose the objection that the business which produced the fund was in violation of law.

Error to the circuit court of DeSoto county. VANCE, J.

The plaintiff in error made the following assignment of errors:

1st. The court erred in calling back two jurors and placing them on the panel after they had been challenged by the plaintiff in the court below and set aside, and the jury had been accepted by the plaintiff, and turned over to the defendant for his acceptance or objection.

2d. The court erred in permitting the testimony of the witness, J. W. Vance, to go to the jury, showing what was said by the testator, J. C. Brown, at the time said witness wrote his will, with reference to the object, purpose and intention of the testator in giving W. T. Brown a legacy of fifteen hundred dollars.

3d. The court erred in permitting the testimony of J. B. Morgan to go to the jury in explanation of the admissions made by W. T. Brown to the plaintiff in error, W. H. Gilliam, with reference to the claim sued on in his action.

4th. The court erred in giving the third charge asked by the plaintiff in the court below.

5th. The court erred in giving the 1st, 2d, 4th, 5th, 6th, and 7th charges asked by the plaintiff in the court below.

6th. The court erred in refusing to give the third charge asked by the defendant in the court below.

7. The court erred in refusing to set aside the verdict and grant a new trial, because the same was contrary to law and wholly unwarranted by the testimony.

*Featherston, Harris, and Watson,* for the plaintiff in error.

The first error assigned embodies the objection of plaintiff in error to the action of the court in replacing in the jury box the two jurors who had been challenged by defendant in error, and set aside. Tales jurors had been summoned and placed on the panel, and defendant in error expressed himself satisfied. It was not competent for the court, when the defendant below asked to have the jury polled, then, upon the mere suggestion of the plaintiff, to exclude the two talesmen and reinstate the two rejected jurors. By the statute, each party in civil cases is entitled to make peremptory challenges. The plaintiff had exercised his right as far as he chose, and was satisfied. The mere exercise of the right of defendant to poll the jury was no sufficient reason for the action of the court in undoing what it had already done. The plaintiff had the right to poll the jury, but did not choose to do so. Cody v. the State, 3 How., 30, 31; Childress v. Ford, 10 S. & M., 30, 31; Lewis v. the State, 9 S. & M., 119; Sam v. the State, 13 S. & M., 189; Nelms v. the State, 13 S. & M., 500; Cotton v. the State, 31 Miss., 509 see, also, 2 Bay, 150; 4 Dallas, 353; 2 Nott & McCord, 261 Williams v. the State, 37 Miss., 407.

The second error relied on is the permitting of the witness, Vance, who wrote the will of J. C. Brown, to testify as to the statements of said Brown as to his object and motive in giving the legacy to the plaintiff. We submit that this was clearly illegal. Written instruments cannot be varied, enlarged, or controlled in their construction by parol testimony. 1 Greenl. Ev., § 275; 1 Phil. Ev., 753; 2 Phil. Ev., 350; 2 Starkie's Ev., 544–548; Boarman v. Johnston, 12 Wend., 573; Stackpole v. Arnold, 11 Mass., 31; Woolam

v. Hearn, 7 Vesey, 218; Hunt v. Adams, 7 Mass., 522. That the circumstances surrounding a party at the time of making a will, are admissible to show the meaning of the language used, is admitted. 1 Greenl. Ev., 340, § 295; see, also, 1 Greenl. Ev., 327, §289; ib., 324, § 287; ib., 331, § 291. And on this subject see what Chancellor Kent says in Mann v. Executors of Mann, 1 Johns. Ch. R., 233. This doctrine has been adopted by our own court. Love v. Buchanan, 40 Miss., 758; Magee et al. v. McNeil et ux., 41 Miss., 25; Redfield on Wills, 524. It cannot be contended that the witness' testimony falls within either of the exceptions stated by Chancellor Kent, and which have been fully adopted by this court in the cases cited.

The third error insisted on is the action of the court in admitting the testimony of the witness, Morgan. This ruling of the court is unsustainable by either reason or authority. What legitimate connection the plaintiff's private conversations with his attorney about this claim, can have with the proof of it before the jury, we are wholly unable to comprehend, and will press the point no further.

The fourth error is the giving the third charge on behalf of the plaintiff. This charge assumes that J. C. Brown must have been the agent of W. T. Brown in carrying the cotton through the enemy's lines. This agency, if it existed, must have been created by a prior appointment by W. T. Brown, or he must have subsequently ratified the acts of J. C. Brown in the premises. These acts of carrying cotton through the enemy's lines was in open violation of the public law of the United States; and no contract, or right growing out of such transactions, can or will be enforced in the courts of justice. If the acts of the agent were unlawful, then, as such, they affect the principal. *Qui facit per aliam, facit per se,* is a maxim of general application. But there is no such thing as agency in crime, all participants are principals.

But it is wholly immaterial whether an agency or a partnership existed between the parties in these transactions; they were clear violations of the law, and the principles of

law applied by the court are the same in either case. The distinction attempted in the third instruction, between a partner and an agent in violating the law, is clearly erroneous. See Battle v. Coleman, 4 Peters, 188; 9 Curtis, 48. This charge is objectionable on another ground. There is no evidence to warrant it. While there is no evidence to establish an agency on the part of J. C. Brown, there is enough to show clearly the partnership between him and W. T. Brown, in all their cotton transactions, in running the blockade and in selling the cotton sued for to the public enemy in violation of law. Instructions should not be based upon a hypothetical state of facts which is without evidence to sustain it; as they would but suggest to the minds of a jury, facts not proven before them. Feirn v. McCaughan et ux., 32 Miss., 18; Wright v. Clarke et al., 34 Miss., 116; Garnett v. Kirkman, 33 Miss., 389; Powell v. Mills, 37 Miss., 692.

The fifth error assigned embraces all the other six charges asked by the plaintiff in the court below. The second charge asserts that J. C. Brown's estate is liable for the cotton sold at Mrs. Wise's sale in 1863, and bought by him, but whether liable to the administrator of Mrs. Wise or to W. T. Brown, it does not state. The legal inference and proper construction would be, that the liability was to the Wise estate—the cotton being sold at the sale of that estate.

The rule of law indicated in the fourth instruction is not correctly stated therein. Redfield on Wills, 516, states the proposition thus: "Where a debtor bequeaths a legacy to his creditor of equal or greater amount than the debt, and of the same character, and payable after the debts became due, it is the practice of the courts of equity to regard it, *prima facie*, as intended to be in satisfaction of the debt." The instruction does not come up to the requirements of this rule. This rule, however, has been seriously questioned, if not overthrown, by the American decisions. Ib., 524, and authorities cited in note. See, also, 2 Roper on Legacies, 1050.

The 6th error assigned, is the refusal of the court to give the 3d charge asked by the defendant. We think that this charge propounds the law of the case correctly, and respectfully request the particular scrutiny of the court, of the testimony of the facts covered by this instruction. That the whole transaction in this cotton of W. T. Brown by J. C. Brown, was, with the knowledge and consent of W. T. Brown, that the intention of both parties was to violate the laws, as well of the United, as of the Confederate States, for the purposes of traffic and gain, cannot admit of rational doubt; upon this point we cite and rely on the following authorities: Wooten et al. v. Miller, 7 S. & M., 385; Armstrong v. Toler, 11 Wheaton, 257; 6 Curtis, 587; Craig v. the State of Missouri, 4 Peters, 436; 9 Curtis, 126; Patton v. Nicholson, 3 Wheaton, 204; 4 Curtis, 199; Green v. Robinson, 5 How. R., 103; Onachita Cotton case, 6 Wallace, 521; Cappell v. Wall, 7 Wallace, 542; Bartee v. Coleman, 4 Peters, 189; 9 Curtis, 49; Martin v. Wade, 37 California.

In the case of Brooks v. Martin, 2 Wallace, 70, the facts are not analagous to those in the case at bar. Martin was entirely ignorant of the illegal transaction by Brooks in the name of the firm of Brooks, Field & Co., out of which the large profit of $72,000 had been realized. Ignorant of this fact, and under the false and fraudulent representations made to Martin by Brooks, the managing partner, as to the embarrassed condition of the affairs of the firm, Martin was induced to sell out to Brooks, for almost nothing, his interest in the concern, then worth, in fact and in truth, at least $30,000. This fraud thus practiced, was the strong grounds to sustain the adjudication of the court in that case. In the case at bar, J. C. Brown was the active partner, and knew all about the character of their transactions, as did W. T. Brown also. No fraud is charged, as between them, in the transaction.

In the last place, we insist that the verdict was not only against the preponderance of the evidence, but that it was manifestly wrong. The testimony is voluminous and not

free from conflict, but we are confident that the court, upon a careful examination of the same, will be constrained to sustain our views of the law applicable to the case.

2d. W. T. and J. C. Brown were not only partners in trade, but they were engaged in illegal trade or traffic in running cotton from Confederate territory through the Federal lines during the late war, and selling it to the public enemy in Memphis; and we hold that J. C. Brown is not responsible to W. T. Brown for these ill-gotten gains, and that no court, either of law or equity, will lend its aid in the enforcement of any claim based thereon. As to the true character of these cotton transactions by J. C. Brown, the evidence leaves no shadow of doubt. They were illicit and in clear violation of law.

*White & Chalmers and Walter & Scruggs,* for defendant in error.

Three defences are set up to this action: 1st. A denial that the testator received the goods. 2d. A settlement and payment by the testator in his life-time. 3d. That the running of the cotton through the Federal lines was an open violation of the public law; that the profits arising therefrom were illegally realized, and that no right of action arises for their recovery. The taking of the property by J. C. Brown, viz.: the wagon, mules, horse, harness, bacon, lard, and the cotton, and the respective prices are clearly and fully established by the evidence. As to that portion of the account, exclusive of the cotton, amounting to $13,420, there is no question of blockade running, nor is there but little conflict in the evidence as to value, and that was clearly for the jury to determine. Anne Whiting proves that in 1862 there were twenty-six bales of cotton on the Theadgill place, all of which was removed by J. C. Brown. Matt. Wilkinson swears he helped to remove twelve bales from that place under W. T. Brown's instruction. Cornelia Brown swears to reception of twenty-six bales by J. C. Brown. McCreely swears that in 1863, J. C. Brown told him that at Wise's sale he had brought twenty bales of cotton from W. T. Brown's place to replace

cotton he had used belonging to the Wise estate. Wesley Brown proves the same facts. Cotton was proved to have been worth from thirty-five to forty cents per pound in greenbacks in that neighborhood at that time, and from sixty cents to one dollar in Memphis. The testator admitted to the witness, Dr. Gray, that in 1863 he had sold twenty bales of his brother's cotton, and had the money in his pocket. The witness, Sloan, proves about the same thing. See, also, to the same effect, the testimony of witnesses Biggs and Mrs. Osborne. Surely this testimony was sufficient to warrrant the jury in their verdict.

2d. But defendant relies upon a settlement between the brothers and payment. This is an affirmative defense, and the burden is upon the defendant. The plaintiff returned from a northern prison about the first of May, 1865; he remained in the county until the last day of May, save one week, when he was trying to go by land to Sunflower county, but high water prevented. On first of June he left Memphis for Sunflower, where he remained until August. J. C. Brown was killed on the 15th of June. During the month the brothers were in the county; they lived eleven miles apart, and are proven to have met but four times; once at the Wise place, where John Gilliam saw them dig up the silver half dollars; once at the cabin of Robt. Wise, where they hid a few silver pieces in the ashes when the alarm of Federal cavalry was given; once at Mrs. Vance's, when she delivered to J. C. Brown the gold she had buried for him; and last, at Memphis, on the first of June, the day plaintiff left for Sunflower county. Though a settlement might possibly have taken place, at some one of these meetings, there is certainly nothing in the evidence indicating that such had taken place. At Memphis, J. C. Brown was too drunk to make a settlement, and had to be put to bed. Against this idea of a settlement urged by the defendant, we oppose plaintiff's extreme poverty in 1861 and 1865, as proved by witnesses Harris and Dooley, who testify to his borrowing supplies for his family, and money with which to buy flour.

As to the statement of plaintiff to Gilliam, that he had no claim against his brother's estate, however damaging this might have been, when left unexplained, it loses its importance add force, when viewed in the light of Judge Morgan's testimony. It is very evident that this statement was made in order to hasten the payment of the $1,500 legacy; and most likely he was, at that time, convinced under the professional advice of Judge Morgan, that he really had no claim against his brother's estate, which he could establish by proof. At most, the declaration cannot amount to an estoppel. 1 Greenl. Ev., §§ 207–209; Cocke v. Kuykendall, 40 Miss.

The idea of a settlement and payment, as urged by the defendant, is utterly overthrown by the testimony of Mrs. Jane Osborne, which is wholly unimpeached by any other witness. She swears that, in June 1865, a few days before J. C. Brown was killed, she met him in Memphis, and proposed to take up her note which the brothers held; that he told her then that his brother William had the note with him, in Sunflower, where he had gone for his wife, that he and his brother had a settlement to make, which would be effected as soon as he returned, and that the note would be taken into the account, and she could then pay it. The brothers never met afterwards. Besides, Gilliam, the defendant, swears that among all the papers of the deceased, he found no trace of any settlement between them.

As to whether there existed a partnership between the brothers, or not, the witnesses Sloan, Biggs, and Mrs. Osborne all testify that J. C. Brown said that his brother William was not a partner with him in blockade running. At all events, this question, like all that preceded it, is purely one of fact, which the jury have found in the plaintiff's favor; and the verdict will not be set aside unless it is entirely unsupported by evidence. But even if they were partners in blockade running, we contend that that fact constitutes no bar to a recovery here, because this suit is not for any balance due plaintiff on partnership account, but to recover the value of

the plaintiff's cotton, which was taken, disposed of, and converted by J. C. Brown.

The objection to the organization of the jury, is not well taken. See Ferriday v. Selser, 4 How., 506; McCarty v. the State, 26 Miss., 299; Marsh v. the State, 30 Miss., 627; People v. State, 13 Wend., 354; Fletcher v. State, 6 Humph., 249; Dayton v. Warren, 10 Missouri, 233. Also, Watson v. Walker, 34 N. H. R.; United States v. Porter, 2 Dallas, 345. So as to the objection taken to the admission of the testimony of Judge Morgan, the plaintiff's professional adviser. Sanford v. Howard, 29 Ala., 684; Commonwealth v. O'Conner, 11 Gray, 94; Peck v. Holt, 15 N. H. Rep., 143. On the point of advice, etc., see, also, Kenner v. the State, 18 Georgia R., 194; Craft v. Bullinger, 18 Ill., 200; Blair v. Marks, 27 Mo. (6 Jones), 579; Law v. Cross, 2 Black., 533; Nelson v. Smith, 28 Ill., 495.

The plaintiff's statements to defendant, Gilliam, were not estoppels, and may be contradicted by himself, unless they caused the other party to take some definite action which would prove injurious if the statements proved untrue. 1 Greenl. Ev., § 200, *et seq.*; Cocke v. Reynolds, 40 Miss. Admissions are the weakest evidence deemed admissible. 2 J. J. Marshall, 65; 4 Monroe, 236–241; Parker v. McNeill, 12 S. & M., 355. See, also, Kelly v. Baker, 41 Miss., 696; Cross v. Black, 9 Gill. & Johns., 198; Baptiste v. DeVolanbrun, 5 Harris. & Johns., 86.

The second error assigned by defendant is the admission of the testimony of Hon J. W. Vance, as to the declarations of the testator in giving to his brother the $15,000 legacy in gold. The will had been introduced by defendant, to show that the legacy was intended as a satisfaction in full for indebtedness due by the testator to his brother. There was no error in the ruling in this matter. Powell on Devises, 433, note 4; 1 Vesey, 521; 2 Williams on Exrs., 932, 933; 2 Lomax on Exrs., 98; Wallace v. Pomfert, 11 Vesey, 568, and authorities there cited; 5 Myl. & Craig, 29; Roper on Legacies, 346–409; and we refer especially to the case of Gilliam v. Chancellor

& Murray,* in which this question has been most elaborately considered by this court.   2 Redfield on Wills, note to page 620, § 52.

The fourth and sixth assignments of error, are the giving of the third charge asked by plaintiff, and refusing the third asked by the defendant.   The propositions embraced in these instructions were the converse of each other.   We insist that this instruction as given was clearly right.   That suit may be maintained upon a contract collateral to, and not directly dependent upon an illegal traffic see Toler v. Armstrong, 11 Wheaton, 258; Green v. Sizer, 40 Miss., 530, and authorities cited; Addison on Contracts, 110, and authorities cited; and see especially Books v. Martin, 2 Wallace, 70; Sharpe v. Taylor, 2 Phillips Ch. R., 801; Tennant v. Elliot, 1 Bosanqut & Pul., 3; 7 Vesey, 473; 1 Bosan. & Pul., 29; 17 How. S. C. R., 232.   See also, Owen v. Davis, 1 Bailey's R., 315.

SIMRALL, J.:

William S. Brown sued William H. Gilliam, executor of James C. Brown, deceased, in *assumpsit*, to recover a claim against the testator founded on open account.   During the trial in the circuit court, several questions arose as to the competency and admissibility of testimony.   The decisions of the court below, on these points, are assigned for error; also, the granting and refusing prayers for instructions, and the denial of a new trial, and the action of the court in empanelling the jury.   First, as to empanelling the jury.

In Ferry v. Selser, 4 How., 518, it is declared to be the duty of the court to watch over empanelling the jury, so as to preserve its impartiality and purity.   In that case a juror was challenged for cause, and although the court disallowed it, when the objection was well taken, inasmuch as the juror was excluded by peremptory challenge, no harm resulted.   In McGowan v. State, 9 Yerger, 184, the verdict was sustained, although it appeared a juror was set aside by peremptory challenge, who should have been set aside for cause.

* *Supra*, p. 437.

In McCarthy v. State, 26 Miss. Rep., 302, it is said to be the duty of the court to see that a fair, competent, and impartial jury is made up, and nothing can interfere with this duty but the right of the parties to challenge peremptorily or for cause.

The parties may select the jury out of the regular venire, and talesmen brought to the bar of the court. To test their qualifications, each one may be examined. Large discretion should be indulged to the court, in any course taken by him, within the pale of the law. The action of the court, in this case, was not an abuse, but a rightful exercise of discretion; no prejudice to either party, did or would happen because of it. Control over the selection of jurors, is committed very much to the discretion of the court. Kinnicut v. Stockwell, 8 Cush., 73; Borden v. Borden, 5 Miss., 79; Watson v. Walker, 33 N. H., 143.

A party complaining in this court ought to show that the circuit court so interfered with the empanelling of the jury as to have deprived the party of some legal right, to his prejudice. The setting aside of a juror, unchallenged by either party, Lewis v. the State, 9 S. & M., 115, or discharging from the panel a juror who has been sworn and taken his seat (before testimony introduced), on discovering that he is incompetent to serve, Williams v. the State, 32 Miss. Rep., 389, McGuire v. the State. 37 Miss. Rep., 376, does not deprive a party of a legal right, and may and ought to be done by the court in a proper case, in order to secure an impartial jury.

As to the admissibility of parol testimony to prove the declarations of the testator at the time his will was written: The purpose of this testimony was to show that the testator did not intend the legacy of $1,500 in gold, to his brother, W. T. Brown, to be in satisfaction in whole or *pro tanto* of his indebtedness to his brother. In Love v. Buchannan, 40 Miss. Rep., 755, the rule as laid down by Chancellor Kent, in Mann v. Executors of Mann, 1 Johns. Ch. R., 283, is approved, " that such evidence cannot be admitted to supply

a contract,. enlarge, or vary the words of a will, nor to
explain the intention of the testator, except to explain a
latent ambiguity, and to rebut a resulting trust." So also is
Magee v. McNeil and wife, 41 Miss. Rep., 25. The question
discussed in the case of Gilliam v. Chancellor & Murray, ex-
ecutors,* was whether the legacy was intended by the testator
to be a satisfaction of the covenant in the marriage settle-
ment. The cases as to the admissibility of parol testimony
were somewhat examined, as well as the principles on which
they were supposed to rest. We did not find it necessary to
announce any conclusion of our own on the subject, inasmuch
as we were of the opinion that the case could be disposed of
by the terms of the will itself, aided by the information fur-
nished by the testimony as to the circumstances surrounding
the testator at the time he made and published his will with
respect to his property and family, and his relations to both.
The general rule is as stated in the cases quoted from 40 and
41 Miss. Rep. The principle has come down to us, in the
books from Chenny's case, 5 Coke Rep., in almost the words
quoted from Chancellor Kent. But there is another principle
quite as ancient and venerable, that a bequest or legacy, to
a debtor shall be presumed to be in payment and discharge
of the debt, and not a gift. In its origin, this presumption
was more stubborn and absolute than it has been expounded
to be in the modern cases. If there be any expression, or
fact in the will indicative of such intent, there is no room for
presumption. It then becomes purely a matter of interpre-
tation.

Inasmuch as the presumption is arbitrary and often in con-
flict with the real motive and wishes of the testator, and seem-
ingly harsh, courts have been prompt to seize upon many
circumstances to counteract and overcome it. It is, doubtless,
because of a discontent with the rule itself, and to prevent
its application (when nothing in the will itself could be
seized upon), that the admission of extrinsic testimony, such
as the declarations of the testator, contemporeous with the

---

*Supra p. 437.

testamentary paper, and afterwards, were let in to prove that the intent was one way or the other. The admission of testimony *aliunde* has never been received with great favor. Slight circumstances upon the face of the will have been taken hold of to repel the presumption, such as the express declaration in the will that all debts must be paid, or words of similar import, or that the legacy is payable upon a contingency, or is in some particular less beneficial than the debt, though more so in others, as where the legacy, though greater in amount, is payable at a future date. Chancery's case, 1 P. Williams, 409, note by Cox; Toller on Exrs., 336; Williams v. Crary, 4 Wend., 443. So if the debt is unliquidated, the presumption will not arise. 3 Atk., 68–96; Williams v. Crary, 5 Cowen., 370; Edelens v. Dent, 2 Gill. & Johns., 185; Strong v. Williams, 12 Mass. R., 391; Eaton v. Barton, 2 Hill, 576. It is laid down in the cases of Williams v. Crary, 6 Cow. R., 246; Clark v. Bogard, 2 Edwards' Ch. R., 387; Van Reeper v. Van Reeper, 1 Green Ch. R., 1; Eaton v. Barton, 2 Hill, 573; Clark v. Bogard, 12 Wend., 65; Zeigler v. Eckhart, 6 Barr, 18; that if it appear from the face of the will, or by evidence *aliunde*, to be intended by the testator as a satisfaction, it will so have effect.

The claim in the case at bar is for an unliquidated sum, uncertain as to the amount, and demanding testimony to ascertain what was owing. It may also have been payable in a different currency, in whole or part from the legacy. The demand largely exceeded the legacy in amount; besides, the legacy was to be paid promptly in gold. The terms of the will rather convey the idea that the legacy was meant as a gift. " I desire that my executors be prompt in the payment of all my debts. I give to my dear brother, Wm. T. Brown (who is now a prisoner of war), $1,500 in gold, to be paid to him promptly." The residue, whether real or personal, is given to his wife. The inducement to bestow the legacy on the brother, is stated to be that he was " a prisoner of war," and the idea of testator was, he would likely come out of his confinement in needy circumstances. The

injunction to the executors is to pay "all debts," and promptly pay this legacy. The testator evidently regarded his estate as able to meet the claims of creditors, assist his brother, and leave a residue to his wife. Within the scope of the rules laid down in the cases cited, we would be warranted in holding that the legacy was not a satisfaction *pro tanto* of the debt, if not on the face of the will itself, when coupled with the fact, that the debt was larger than the legacy, and for an unascertained amount, arising rather *ex delicto* than *ex contractu*, and that there was no need, therefore, to resort to parol testimony to compel a presumption of ratification. Whilst the admission of the testimony in this case was unnecessary and superogatory, yet in the view we have taken, there was no satisfaction of the debt, and this parol testimony only going to show that such view is correct, being confirmatory and cumulative, we do not feel inclined to reverse for this cause. If in its absence, there was no satisfaction, its presence could produce no other result, and no harm ensued to the defendant. We think it ought not to have been allowed in this case, nor in any other where the nature of the claim and the terms of the will induce the legal conclusion that satisfaction does not obtain; for to allow it in such case would be for the useless purpose of repelling a presumption which does not arise.

3d. Was the testimony of Judge Morgan competent? By the plaintiff it is claimed to be admissible, as showing the state of mind and motives of admissions made by him to Gilliam, the executor; and by the defendant it is objected to, because it is at a different time and place, and proposed to place before the jury conversations and statements made in his absence. The plaintiff would have the right to deduce all that was said in his interview with Gilliam, so that the jury might see under what circumstances the conversation was had, and be prepared to place the proper estimate on any admission then made.

It has been well said, "that admissions may be the strong-

est, or the weakest evidence." If there be a full, deliberate statement made by a party to one interested to hear, as to a subject matter then or afterward in suit, such admissions are entitled to weight, for the mind of the party was distinctly directed to the subject. But a single, separate declaration, casually made, in loose or idle conversation, would not deserve much consideration. It is also important to know the motive or reason that induced the admission. Therefore, if made in negotiation of a compromise, or to deprecate the anger of the adversary, or in the heat and excitement of a discussion, the circumstances ought to be disclosed, for in the first instance they would be altogether excluded, and in the second should be but lightly esteemed. If the admission occur, however, in a deliberate conversation, with the mind directed to the subject, then it would be entitled to great weight.

It is a familiar rule, that a party cannot make testimony for himself, and therefore, he cannot prove his own statements or admissions. But where he is entitled to the benefit of a fact, or act done by himself, in evidence, or such fact or act is put in evidence against him, then his declarations contemporaneously with the act, or fact, explanatory of its quality and motive, should be admitted. The rule is the same if the act be done by his agent. Such was the case of Sanford v. Howard, 29 Ala., 694. The defendant was sued on a promise to pay for goods supplied the minor children of his testator. Suits had been previously brought against the children, which fact was put in evidence by the defendant. The plaintiff then offered to prove the advice of his attorney, that the bringing of these suits would not prejudice his action against the defendant. The testimony was admissible as explaining the act, or as part of the *res gestœ.* So, also. the Commonwealth v. O'Conner, 11 Gray, 94. A drainer was found in defendant's shop. It was contended for the Commonwealth that this was a criminating circumstance—it being an implement used in the traffic in intoxicating liquors. It was held competent for the defendant to show that the

drainer was procured for a different purpose. The declarations made by the defendant at the time of ordering the drainer as to the purpose for which it was to be made were competent, as part of the *res gestœ*, qualifying and explaining the act done.

There are many qualifications of the general rule, that a party cannot prove his declarations or statements in his own favor. Where the matter in issue is compounded of fact and intention, they are competent if made before *lis motam* or as part of the *res gestœ*. The cases of Cross v. Black, 9 Gill. & Johns., 198 ; Offutt v. Edwards, 9 Robinson's La. R., 90, and Baker v. Kelly, 41 Miss. R., 702, are illustrative of this. These were controverted attachments, on the ground of the defendant's removal out of the state. The precise point was whether the removal was temporary or permanent, and the declarations made out of the presence of the plaintiff (before suit brought), as to the character of the removal, whether permanent or not, were competent evidence. Indeed, when motive is an element in the issue, it can only be established by the acts and declarations of the party, but these acts and declarations must be done and made at a time when they are free from suspicion—generally before the legal controversy has originated.

The import of the testimony of Morgan was, that Brown, the plaintiff, in the latter part of 1865, and early part of 1866, applied to him as attorney, to sue upon his claim, when he advised against it for want of sufficient testimony to sustain the demand. Now the only effect that this testimony could produce on the mind, was that Brown had a demand against his brother's estate, which he was disposed to push by suit, and that in his judgment, it was a fair claim. And either because he might fail in the suit, or to deprecate the displeasure of the executor, and perhaps postpone the reception of the legacy, he did not then proceed a. law.

Taking all the admissions to Gilliam together, which this was offered to explain, and they amount to this: He had no claim against the estate, which he would urge by suit, but

he thought he ought to be paid $1,600 on account of some cotton, and also for his wagon and mule. There is no pretence in law, that Brown was estopped by his admissions to Gilliam from preferring his claim against the estate, by amicable demand or suit, if he chose to do so. An estoppel *in pais* shuts up a party, from asserting a demand or pressing a right, because in the circumstances, to allow it to be done would be to perpetrate a fraud upon another, to his injury. To illustrate the principle, if A proposes to purchase B's note, and before the sale is consummated, informs B of what he is about to do, and asks him if he has defense against the note, and B responds in the negative, and the purchase is made, B would be estopped from setting up a defense, however well founded; because A has advanced his money on the faith of his declaration, and it would be a deceit and a snare to him if allowed.

A person may say, however emphatically, that he has no claim against another which he proposes to enforce or demand. Yet if he does produce a debt well founded in law and fact, established to the satisfaction of the jury, his disclaimer is not a legal bar to the suit. And notwithstanding such disclaimer, a jury may allow it. It is a fact, however, justly challenging the grave consideration of the jury, who are the final judges of the weight of testimony. We think that the testimony of Morgan ought not to have been admitted to the jury.

The third instruction granted for the plaintiff, and the converse of it refused, at the prayer of the defendant, go to the merits of the controversy, and have especially engaged the attention of counsel. This instruction asserts the proposition that although the traffic in cotton between a resident of DeSoto county, and parties residents of Memphis, Tennessee, was illegal, at the time part of the transactions, out of which this suit originated were carried on, yet if Jas. C. Brown took the plaintiff's cotton with his consent, and as his agent carried it into Memphis, and there sold it and received the money, which his executor, the defendant, still

had, that the traffic through the lines had long since ceased, the plaintiff was entitled to the money, the proceeds thereof.

It is conceded by counsel on both sides, that this trade in cotton, whilst the war was flagrant between parties resident, the one in territory occupied by the military forces of the United States, and the other by the forces of the Confederate military organization, was denounced by the public laws of nations, by the acts of the Congress of the United States, and the proclamation of the President in pursuance thereof.

The grave question is, where profit and gain has accrued from this unlawful traffic, and these gains are in the hands of an agent, can he be called to account in a court of law by his principal. If the plaintiff, W. T. Brown, permitted his brother, J. C. Brown, to take his cotton into Memphis, and there convert it into money, does not the illegality, and legal turpitude imputed to the transfer and sale, so attach to the act, and himself as a *particeps*, consenting to it, as that a court of justice will altogether refrain from adjudicating between the parties, on the ground that *ex turpi causa non oriter actio*. Generally those who violate law in their dealings with one another, are left in precisely the condition they placed themselves. As to third persons, injured by their acts, courts are free to give full redress. Those who make the covinous conveyances, and other acts denounced by the statute of fraud and perjuries, are not permitted to apply to the courts for extrication from the consequences of their fraudulent acts, if the grantee prove false to the secret trust reposed in him. It is not disputed that a remedy will not lie on the illegal contract itself. If J. C. Brown had obligated himself to carry W. C. Brown's cotton into Memphis, and sell it, no suit could be sustained for a non-performance. But where the illegal adventure has been accomplished, and the money arising out of it is in the hands of J. C. Brown, or his legal representative, what law is violated, what rule of public policy is infringed, what encouragement is given to the violaters of law, by compelling him to turn over the money

to his principal? If the sensualist makes provision for his cast-off mistress, is morality put to the blush by the act—would the legal tribunals frown upon such a contract? It was very aptly said by Lord Mansfield, in Hulman v. Johnson, Cowp. Rep., 343 : " The objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of a defendant. It is not for his sake that the objection is ever allowed, but is founded on the general principles of policy, which the defendant has the advantage of, contrary to the real justice between himself and the plaintiff." The ends attempted to be reached by the principle is to restrain and discourage a violation of law by withholding a remedy, founded on the illegal contract. Therefore, the law esteems a promise, made in consideration of future cohabitation, to be utterly void; yet a bond or deed made for a past cohabitation is good. Froninger v. McBurny, 5 Cow., 253 ; Chit. Cont., 516. In the latter case, the offense against morals was already accomplished. The bond or deed was not the inducement that brought it about.

The point is full of embarrassment, and we have maturely considered it with a view of apprehending some principle that may reconcile the adjudications. The general principle laid down in a great number of cases is to this effect: That if the contract grows out of an illegal act, a court of justice will not enforce it. But if the promise be unconnected with the illegal act, and is founded on a new consideration, it is not tainted by the act. A new contract founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful. Armstrong v. Toller, 11 Wheat., 269 ; Craig v. Missouri, 4 Pet. Rep.; Roby v. West, 4 N. H., 290 ; Patterson v. Nicholas, 3 Wheat., 204 ; Wooten v. Miller, 7 S. & M., 385.

It has been observed that the test, whether a demand connected with an illegal act, can be enforced, is whether the plaintiff requires any aid from the illegal transaction to establish his case. Simpson v. Bloss, 7 Taunt., 246 ; Roby v. West,

4 N. H., 290.   Subjecting the case at bar to this test, and it is
manifest that the demand of W. T. Brown against his broth-
er's estate, must be traced back to the illegal traffic in the
cotton; putting the claim in the simplest form of speech,
and it takes this legal form.   There was no express contract
that J. C. Brown would account and pay over to his brother
the proceeds of the cotton passed through the military lines
and sold, nor was there a subsequent promise that he would
pay the money thus realized.   It comes to this, then, that by
his so removing and selling the cotton with the consent of
W. T. Brown, the law implied a promise that he should pay
for it.   The law will never imply a promise where an express
promise would be invalid, or would not be enforced.   If J. C.
Brown had made an express promise that he would take the
cotton to Memphis, sell it, and pay the proceeds to his brother,
such contract would have been an engagement to violate law
and duty, and no suit could be maintained upon it.   It is
conceded that W. T. Brown had no right of action grounded
on the refusal of J. C. Brown to comply with his agreement
to remove and sell the cotton.   But the other member of the
fact is, that he will account for the proceeds.   To allow a suit
on this, would be to give effect to the illegal bargain.   This
is hardly, then, a case where a subsequent contract relates
back and attaches itself to the original illegal act, for the
only contract shown to exist, if any, is such as the law will
imply.

There are a class of cases which it is very difficult to take
out of the range of these principles.   In Fainbury v. Renous,
4 Burr, 2096, several persons had been engaged in illegal
stock-jobbing, with a third, and sustained a loss.   One of
them paid the whole, and took a security from the other, for
his share.   This security was held valid as a new contract.   It
is hard to see how this can be separated from the original
transaction.   Its consideration rested on the loss, which the
party ought to share; yet the court would have held that
*indebitatus assumpsit* would not lie for contribution of an

*aliquot* part of the loss. Lord Mansfield declared that it was a fair, honest transaction " as between the two."

Thompson v. Thompson, 7 Vesey, jr., was an application to be paid a sum of money in consideration of the resignation of the command of a ship in the service of the East India Company, in favor of the defendant. The master of the rolls (Sir William Grant), thought the contract illegal. There is no claim to the fund except through an illegal contract. " If the company had paid this money into the hands of a third person for the use of the plaintiff, he might have recovered from that third person, who could not have set up this objection as a reason for not performing the trust." There is nothing collateral in respect of which (the agreement being out of the way), a collateral demand arises.

Tennant v. Elliott, 1 Bos. & Pul., 3, was this : The defendant, being a broker, effected an insurance for the plaintiff, a British subject, on goods in an imperial ship, bound to the East Indies. Such insurance came within the statute of 7 Geo. 1, Ch. 21, and was illegal. The ship being lost, the underwriters paid the amount of the insurance to the defendant, who, without any intimation from them to retain it, refused to pay it over to the plaintiff. The argument at the bar against the recovery was : The defendant, the broker, is in nature of a stakeholder, and the plaintiff's right of action being grounded on his claim against the underwriters, he must stand in the same situation as if he had sued them. To this, Buller, J., replied : " Is the man who has paid over money to another's use, to dispute the legality of the original contract? Having once waived the legality, the money shall never come back to his hands again. To whom is he to pay it over ? Who is entitled to it but the plaintiff?"

Eyre, Ch. J. : " The defendant is not a stakeholder. The question is, whether he, who has received money to another's use, on an illegal contract, can be allowed to retain it, and that not even at the desire of those who paid it. I think he cannot."

Parner v. Russel et al, 2 Bos. & Pul., 296, was this: The indebtedness arose out of carrying counterfeit coin to Portsmouth. It did not appear that the carriers were acquainted with the contents of the boxes. The defendants had received money from the person at Portsmouth, and had accounted to the plaintiff for the whole of it, except £13, the subject of the action. The Chief Justice states the question thus: The plaintiff's demand arises simply out of the circumstance of money being put into the defendant's hands to be delivered to him. This creates an *indebitatus* from which an *assumpsit* arises. Buller, J., said the plaintiff's case was made out, when he showed that the defendant had recovered so much money for his use, and it was immaterial whether the money was paid on a legal or illegal contract. The money having been paid " by another " to the plaintiff's use, the illegal contract is out of the question.

Alcinbrook v. Hall, 2 Wils., 302, was for money lent to pay a bet at a horse race. Fainbur v. Renous, Burr, 2069 was a loan of money to pay differences in a stock-jobbing bargain where the defendant was privy to the transaction.

In Owen v. Davis, 1 Bailey, S. C. Rep., 316, the plaintiff was the joint owner of the note of one Murray, which had been given for money lost at cards. The whole of the note had been paid to the defendant. The plaintiff claimed half of it as money paid for his use. The objection was the illegality attaching to the transaction. The judgment of the court went upon the ground that if the defendant had received money, of which, by an agreement between them, the plaintiff was entitled to half, there was no sound principle on which the fact that it had been received on an illegal contract would entitle the defendant to violate his agreement. Murray would have been protected in refusing to pay, but as he had paid, the plaintiff was certainly entitled to recover his share of the fund.

The case of Sharp v. Taylor, 2 Phillips Ch., 801, was very maturely considered by the Lord Chancellor. In that case the complainant sought a share and division of the profits,

which had been earned by a vessel engaged in a traffic which was in violation of the navigation laws of both the United States and Great Britain. The defendant interposed the illegality of the traffic, as an objection to the relief. To this plea the chancellor responded : " Can one of two partners possess himself of the property of a firm, and be permitted to retain it, if he can show that in realizing it, some act of parliament has been violated ? The transaction alleged to be illegal is completed and closed and will not in any manner be affected by what the court may do between the parties."

So, too, in Brooks v. Martin, 2 Wallace 79. It is directly stated that the business of dealing in soldiers' bounty land claims, as provided in the copartnership articles, was illegal and violative of the act of Congress, February 11, 1847. After large gain, however, had been made in the business ; on a bill brought by one partner to set aside a fraudulent settlement made between the parties and for an account and division of the profits, the principle is affirmed that one partner who has obtained possession and control of the funds will not be permitted to refuse to do equity to his other partners because of the money originally due or intended for the soldier. This statute made in the interest of the soldier and for his benefit cannot be made more efficient by leaving all the funds and profits in the hands of Brooks. The illegal transactions have become accomplished facts, and cannot be affected by any action of the court between these parties.

So long as an illegal contract is, *in fieri*, in the course of execution, neither party can have a remedy grounded upon it, either for its specific enforcement or for damages for any breach of it. Russell v. Wheeler, 17 Mass., 281 ; Sheffner v. Gordon, 12 East, 304.

But the principle seems to be well established that after the illegal contract has been executed, one party in possession of all the gains and profits resulting from the illicit traffic and transactions, will not be tolerated to interpose the objection that the business which produced the fund was in violation of law, and, therefore, the plaintiff, jointly interested in

its profits and gains, cannot ground any claim to an account and share thereof. All the harm that can inure to the public by an infraction of law has already accrued; and it were to encourage hypocrisy and gross dishonesty to permit a party fresh from a violation of the law, to set up his own turpitude as a shield and protection against a division of the gains of the illicit business with one jointly entitled to share them.

It is patent to observe the struggle of the courts, and a gradual advance to escape from the unjust consequences of the universal application of an acknowledged principle, and the distinctions, not always palpably suggested by a sense of justice, to except special cases. In the earlier cases, if the money (the fruit of the unlawful business) was deposited with a third person for the plaintiff, this was treated as a collateral contract, and he was not permitted to defend on the ground of the illegality of the original act. As put by Justice Buller on the broad premise, that the moment the money passed into the stranger's hands, he held it as trustee for the plaintiff. As stated by the supreme court in McBlair v. Gibbs, 17, How. S. C., 236, an implied promise, arising out of the receipt of the money was a new contract not affected by the illegality of the original transaction. It was further enlarged or illustrated, as in the case of several engaged in stock-jobbing gambling, when one paid all the losses and took from the other his obligation for his contributory part. All were implicated in the illegal act, and no third person intervened as stake-holder or trustee. A further extension was made when one who had collected the winnings at a game of hazard was compelled to pay a moiety to his associate in the winning. After pushing the principle thus far, it were easy to afford relief to a partner against his co-partner who had taken to himself all the profits of a business forbidden by legislative enactment. Within the range of the same doctrine is embraced the case of him who confides his money or his property to another, to be embarked in an illegal traffic, after the dealings are over and the business ended; that the money

realized shall be regarded as had and received for the plaintiff's use and an implied *assumpsit* to account for it.

Whilst affording this relief the courts are not obnoxious to the imputation of giving effect to illegal contracts or encouraging immoral acts. In all these cases the violation of law has already been accomplished and one party is found in possession of money which belongs to another, and no detriment can arise further by raising an *assumpsit* to pay it over to the principal.

In some of the cases closest in analogy to the one under consideration the suits were in chancery. This can make no difference, for a court of equity will no more lend its aid to an iniquitous transaction than a court of law, and a plea of " illegality " or *contra bonos mores* is just as available in the one jurisdiction as the other.

Without commenting on the several charges granted on the prayer of the plaintiff, we think they conformed to the views we have expressed. For the error in admitting the testimony of Morgan the judgment of the circuit court is reversed and the cause remanded for a *venire facias*. We forbear comment on the testimony or its weight as involved in the motion for a new trial, as that subject especially belongs to the province of the jury.