## B. S. CRUTCHFIELD v. W. H. RAMBO.

Decided March 29, 1905.

**1.—Illegal Contract—Lottery Tickets—Public Policy.**

Where two parties each purchased lottery tickets and agreed to share equally whatever the tickets might draw, and the ticket held by one of them drew a prize in money, which he collected, the other party could not enforce through the courts the contract to divide because it was contrary to law and public policy.

**2.—Same—Test of Enforcement.**

The test whether a demand connected with an illegal act can be enforced is whether the plaintiff requires any aid from the illegal transaction.

Appeal from the District Court of Tarrant. Tried below before Hon. M. E. Smith.

*Ray Hunter, Hunter & Flood* and *Theodore Mack,* for appellant.— The court erred in its conclusion of law that the whole transaction and agreement made between the parties was illegal, and in violation of the law and public policy of Texas, and that the contract to share in the profits to be realized from the transaction was unlawful and opposed to public policy, because there is no law in Texas, nor public policy, pro- hibiting or invalidating the agreement of plaintiff and defendant to di- vide the proceeds or profits of what their respective tickets might draw in the lottery, the law prohibiting only the sale of tickets, or parts thereof, or keeping or offering the same for sale. Russell v. Kidd (Ct. Civ. App.), 11 Texas Ct. Rep., 526; De Leon v. Trevino, 49 Texas, 91; Lewis v. Alexander, 51 Texas, 589; Pfeuffer v. Maltbie, 54 Texas, 461; Wegner v. Biering, 65 Texas, 511; Labb v. Corbett, 69 Texas, 503; Dixon v. Sanborn, 72 Texas, 360; Wann v. Kelley, 5 Fed. Rep., 587; Patty v. Bank, 15 Texas Civ. App., 475, 41 S. W. Rep., 177; Brooks v. Martin, 69 U. S., 70, Book 17, L. Ed., p. 732; McBlair v. Gibbs, 17 How., 232, Book 15, L. Ed., p. 132; Thompson v. Gray, 1 Wheat., 75, Book 4, L. Ed., p. 40; Planters' Bank v. Union Bank, 16 Wall., 483, Book 21, L. Ed., 473; Armstrong v. Toler, 11 Wheat., 258, Book 6, L. Ed., p. 472, 2d par.

*W. P. McLean,* for appellee.—An analysis of the contract as set out by appellant, and as found by the court, shows that if anything passed from one of the contracting parties to the other it was an interest in lottery tickets. It will be noted that, at the time of the agreement, which was on the 4th day of February, 1904, there had been no drawing by the lottery company affecting said tickets, and that the drawing did not occur until the 13th day of February, 1904. If appellant, by virtue of his alleged agreement, acquired anything from appellee, it was an interest in the two lottery tickets then held by appellee, and the consid- eration given was a one-half interest in the tickets held and owned by appellant. It was by virtue of these tickets, or some of them, that the ultimate object, to wit, the drawing of money, was to be attained. These tickets represented and evidenced the ownership of whatever

money might be drawn from the lottery by them or either one of them. That is, each ticket represented an interest in the drawing for which they were issued, and the owner of a successful ticket would be entitled to whatever it might draw by reason of his ownership of such successful ticket. Therefore, we submit that, if no interest in the tickets held respectively by appellant and appellee passed from one to the other, by reason of such agreement, that there was no consideration to support the agreement, and nothing passed by virtue of the same. If, however, the effect of the agreement was to pass from one to the other of the contracting parties, any interest in the tickets which they respectively held, then the transaction was in violation not only of the spirit, but also of the letter of the law, which makes it a penal offense to sell lottery tickets or parts of the same in this State. It has been repeatedly decided by courts of last resort that no recovery can be had by the holder of a lottery ticket against the lottery company for any prize that may be drawn, in jurisdictions where lotteries are prohibited by law. It has been further universally held, whenever the question has come up, that the lottery company can not even collect from its agents the money taken in by the agents from the sale of lottery tickets, in jurisdictions where lotteries are made unlawful. So that neither Rambo nor Crutchfield had anything upon which they could trade or upon which they could base a binding legal promise, so far as their lottery tickets were concerned, at the time that they made the alleged agreement. We submit that the consideration for the alleged agreement was illegal, because it was simply an exchange by the parties with each other of interests which they held in the lottery tickets, and that such exchange amounted in law to a sale from one to the other of an interest in lottery tickets, and it is by virtue of such interest so purchased by appellant in the ticket of Rambo that he seeks a recovery in this suit. He can no more recover from Rambo on such a transaction than Rambo could have enforced his claim within the State of Texas against the lottery company for recovery of the amount drawn by the ticket. The entire transaction as set out by appellant in his petition in the court below, and, as shown by the findings of the trial court, was illegal, in violation of the spirit and intent of the statutes of the State of Texas prohibiting lotteries within this State, and is in violation of the public policy of this State on the subject of lotteries. Floyd v. Patterson, 72 Texas, 202; Roselle v. McAuliffe, 35 S. W. Rep., 1135; Funk v. Gallivan, 49 Conn., 124; Goodrich v. Houghton, 134 N. Y., 115; Russell v. Kidd, 11 Texas Ct. Rep., 526.

FLY, ASSOCIATE JUSTICE.—Appellant instituted this suit against appellee, and alleged in the petition: "That heretofore, to wit, on the 4th day of February, 1904, the plaintiff and defendant each purchased at Fort Worth, Texas, two certain lottery tickets in the Honduras National Lottery Company, of Puerto Cortez, Honduras, paying therefor the sum of twenty-five cents each; that, after the purchase of said tickets, the said plaintiff and defendant, for a valuable and sufficient consideration, agreed by and between themselves that each should hold the two tickets so purchased by him until the drawing, and that if either of the two tickets held by the defendant should draw any prize or sum of money, that defendant would pay over and deliver to the plaintiff one-half

thereof, and as a consideration of said promise the plaintiff agreed and promised the defendant that, if either of the tickets so held by him should draw any prize or sum of money, that he would pay over and deliver to defendant one-half of whatever said tickets, or either of them, might draw in said lottery; that afterwards, to wit, on the 13th day of February, 1904, one of said tickets so held by the defendant, to wit, the one numbered 94,289, drew the sum of $3,750, and afterwards, to wit, on the 20th day of February, 1904, the said lottery company paid over to the defendant the said sum of money."

Appellee answered by a general demurrer and general denial, and specially, that the agreement alleged by appellant was illegal and void, and was without consideration, and that, if any such agreement had been made, it had been fully settled by appellant accepting $750 in full payment of his claim against appellee. Judgment was rendered in favor of appellee.

There is no statement of facts in the record, and the findings of fact of the trial judge must form the basis of the opinion of this court. It was found by the court that appellee, on February 4, 1904, told appellant that he intended to purchase two tickets from the agent of the Honduras National Lottery Company of Puerto Cortez, Honduras, who was selling lottery tickets in Fort Worth, Texas. The appellant gave appellee fifty cents, with the request that he buy him two tickets also. Appellee bought two tickets for himself and two for appellant, paying twenty-five cents each for them. He delivered the two to appellant that he had bought for him. A proposition was then made by appellee to appellant that, if the latter would give him one-half of what his (appellant's) tickets might draw, appellee would give appellant one-half of what his (appellee's) tickets might draw in the lottery drawing. This offer was accepted by appellant, each party, however, retaining his own tickets. On February 13, 1904, the lottery company had its drawing at Puerto Cortez, Honduras, and one of appellee's tickets drew the sum of $3,750, and appellee placed his ticket in the hands of the National Bank of Fort Worth for collection. The amount was collected and placed to the credit of appellee, less the sum of $37.50 for cost of collection. Appellant demanded one-half of the amount, claiming that he was an equal partner, under their agreement, with appellee, in any proceeds from the tickets. Appellee refused to accede to that request, but did give appellant $750, which the former believed to be a settlement of all differences between the parties. The court found, however, that appellant did not so regard it, but accepted what was paid him.

The trial judge held that the contract between the parties to divide the proceeds arising from a drawing in a lottery, was contrary to law and public policy, and should not be enforced. We think the conclusion was correct. Lotteries are condemned by the laws of this State, and punishment is provided for those who establish lotteries or who may be engaged in the sale of lottery tickets, and it follows that any contract dependent upon lottery tickets is manifestly contrary to public policy. The contract in this case was based upon the chance of drawing a prize through one or more of the tickets they had purchased, and it would not matter if, as contended, that the parties had formed a partnership, and had bought the tickets, the law would not lend itself to compel an

accounting between partners engaged in a scheme to make money that is condemned by the laws of the State. There can be no force in the argument that buying lottery tickets is not prohibited by the laws of Texas, and consequently a contract based on the purchase of such tickets would not be obnoxious to public policy. The law, in condemning the sale of lottery tickets, put the stamp of disapproval upon the whole transaction, and the buyer, although no penalty is attached to his act, is engaged in violating one of the statutes of the State. Suppose that a ticket bought by some person should draw a sum of money, but it should be withheld from the purchaser of the ticket, no court would aid the collection of the money from the lottery for the reason that the buyer and seller would be in pari delicto, and could not enforce their contracts in the courts of the State.

Appellant advances the broad proposition that, although the contract as to a division of the possible amounts arising from the lottery drawing was illegal, "yet the law will compel one party to such illegal contract, after the same is completed and the gains and profits collected, to divide with his associate in the contract or enterprise, and fairly according to the terms of the illegal contract." Neither the authorities cited by appellant, nor any others consulted by this court, sustain that proposition. In the cases cited by appellant money had been acquired by and through illegal contracts, and those contracts were not enforced, but in every instance agreements made, about the property that had been acquired through the illegal original contract, after its acquisition, were the ones enforced.

In the case of Pattey, Joiner & Co. v. Bank (15 Texas Civ. App., 475, 41 S. W. Rep., 173), property had been acquired through an illegal combination, and one of the partners, desiring to make an assignment of his individual assets to pay his individual debts, transferred to his partner all his interest in the firm assets for the purpose of allowing such partner to pay the firm debts, which was fairly done. The contention was that the partnership to buy cotton, by suppressing competition, was void, and that the assets acquired were owned by the partners individually, and should pass to the individual creditors. This contention was not sustained. The gist of the decision is expressed in a quotation made therein from De Leon v. Trevino (49 Texas, 88, 30 Am. Rep., 101): "But if a contract is illegal, certainly it does not follow that it is illegal or immoral for the parties, after its completion, to fairly settle and adjust the profits and losses which have resulted from it."

In the case of Russell v. Kidd (Texas Civ. App.), 11 Texas Ct. Rep., 526, an agent had collected the fruits of a wagering contract for his principal, and it was held that the agent could not hold it against his principal. And this was correct, because the only legitimate inquiry in the case was, Had the agent collected money belonging to his principal and failed to pay it to its owner? The same doctrine was laid down in Floyd v. Patterson (72 Texas, 202, 13 Am. St. Rep., 787), and the true rule governing in such cases is clearly stated.

In that case a broker in Tyler was acting for other brokers in Houston in dealing in wheat futures, and bought futures on account of Patterson. There was a profit of $625. The brokers, Floyd & Co., refusing to settle, Patterson sued and recovered against them for the full amount

of his demand. The Supreme Court, through the present Chief Justice, Gaines, held: "It is well settled that a contract for the future delivery of stocks, produce, or other merchandise in which an actual delivery is not contemplated, but only a payment of the difference between the contract price and the delivery of the article at the time agreed upon as the date of delivery, is a mere wagering contract which will not support an action. But if the transaction has been completed, and another grows out of it collateral to it, dependent upon a new consideration, the new contract is not vitiated by the taint of the old one, and will be enforced." The court then quoted from Gilliam v. Brown (43 Miss., 641), the rule governing in such cases: "It has been observed that the test whether a demand, connected with an illegal act, can be enforced, is, whether the plaintiff requires any aid from the illegal transaction to establish his case." In Oliphant v. Markham (79 Texas, 543, 23 Am. St. Rep., 363) the rule is reiterated. If that rule be applied to the facts herein appellant has no case. Without proof of the illegal contract he has not shown any possible ground of recovery. If appellee had, as agent of appellant, collected money from the lottery company, due by it to appellant, then he could recover without the aid of the illegal contract on allegations and proof of such collection. But no such state of facts appear in this case. Appellee collected the money, not as agent for appellant, but for himself, on a ticket bought by him and for his own benefit.

The rule above stated is the one laid down, not only in the cases cited by appellant, but is the universal rule in American courts. And in Texas it has been held that courts will not enforce an accounting between partners engaged in an illegal enterprise. In the case of Read v. Smith (60 Texas, 379), the leading case of De°Leon v. Trevino, above cited, is reviewed by Judge Stayton, and the conclusion reached, as in the leading case, that contracts that are collateral to, and not a part of the illegal contract, which had been fully completed before the contract upon which the suit is based was entered into, can be enforced. In Read v. Smith the parties had formed a partnership to deal in county scrip, Smith being sheriff and tax collector. The latter brought suit to recover the value of one-half of the county scrip bought by the partnership. The contract of partnership was held to have been illegal, and the court said: "The plaintiff claims the value of one-half of the scrip. Why? Because, while sheriff, he made the agreement set out, and, in pursuance therewith, furnished the money with which the paper was bought. Thus, is he compelled to set out the agreement, illegal as it is shown to be by the answer, as the sole basis of his right. . . . In such a case as is made by the pleadings, we believe that the law forbids relief to either party in the way of forcing an account and settlement between them, they never having made a settlement themselves."

In the case of Wiggins v. Bisso (92 Texas, 219, 71 Am. St. Rep., 837), the case of Read v. Smith is approved, and it is said: "If the facts alleged by the defendant in his answer be true, Bisso and Wiggins entered into the partnership agreement for the purpose of violating the laws of the State of Texas, by procuring a contract between themselves and the brewing association, which in its terms was a distinct violation of the anti-trust law of this State, approved March 30, 1889. The par-

ties agreed to enter upon a business the conduct of which involved daily violation and disregard of the laws of the State, out of which violation of the law the profit sued for accrued. Bisso can not recover in this case without proving the contract of partnership between himself and Wiggins, and must recover, if at all, according to its terms. . . . Under the circumstances alleged in the answer the courts of this State will not investigate such transactions, but will leave the parties as they find them."

The case of Roselle v. McAuliffe (Mo.), 35 S. W. Rep., 1185, and 39 S. W. Rep., 274, is very similar to this. The parties, seven in number, in that case as in this, had agreed to hold, as a joint venture, the tickets they had obtained in the Louisiana Lottery. Each person paid one dollar, and agreed to divide equally any winnings of any of the tickets. Each ticket was identified as belonging to some particular member of the club or partnership. When the drawing took place it was ascertained that the ticket held by Roselle had won a prize of $2,500, and two other tickets drew small prizes amounting to twenty-five dollars. Roselle sent the three tickets to New Orleans and obtained for them a draft on a New York firm drawn payable to his order. He, in company with Beckemeir and Tassaro, two of the club, took the draft to a local bank to have it cashed. The bank received it for collection, and it was agreed by the three parties that the bank should collect the money and place three-sevenths of it to the credit of Roselle, one-seventh to the credit of Tassaro, one-seventh to the credit of Long, and two-sevenths to the credit of Beckemeir. The three-sevenths given to Roselle included two shares, of one-seventh each, which would have been due to McAuliffe and Smith, the other club members. Roselle did not receive it as their portion, however, but immediately afterward told them they could not get it, except at the hands of the law. The court held that the agreement made by Roselle, Tassaro and Beckemeir was enforceable, as it was not dependent on the original agreement for its enforcement, but as to those members who were not parties to the agreement after the prize was drawn, and the draft for it received, it was held that they could not recover their share from Roselle, who had collected it, on the ground that the validity of their claim depended on the validity of the original agreement to pool the club tickets. The court said: "Our jurisprudence withholds the aid of the courts for the enforcement of such arrangements, and usually leaves the parties thereto where they have placed themselves. It is true that the plaintiff himself, in the estimation of law, is equally as culpable as the claimant, whose claim, under the illegal agreement, he defeats, because of the rule that, in case of equal wrong, the party in possession has the better standing. That maxim of the law is not, strictly speaking, a mere defense to an action. It is a rule of public policy, founded on moral principle, and should be enforced by the courts whenever facts are developed justifying its application, whether the rule be pleaded or suggested by any party to the action or not. The rule is established for the sake of the moral example it affords, not for the benefit of the wrongdoer in possession of illegal spoil. (Seidenbender v. Charles, 4 Serg. & R., 173, 8 Am. Dec., 682.) There are, no doubt, states of fact which have been held to afford reasons for withholding application of that rule; and sometimes

exceptions to it are made by positive law, as, for instance, by the terms of chapter 73, Missouri Revised Statutes, 1889, permitting money lost at gaming to be recovered. But McAuliffe's claim can not be located in any of the exceptional cases. Neither plaintiff nor the bank received even the original dollar he paid for his chance in the game. McAuliffe is not seeking to recover back any money he has lost or paid. He only asks the aid of the court to secure part of a prize fund which his lottery investment is supposed to have won." The laws under which the transaction was held to be contrary to public policy are practically the same as those of Texas.

There is no error in the judgment, and it will be affirmed.

*Affirmed.*

Writ of error refused.