## JANE J. HOUSE et al. vs. J. A. HARDEN et al.

1. MARRIED WOMEN: *Separate estate.*
Where the husband uses the money belonging to his wife in the purchase of land, under an agreement that he will take the deed to land in the name of his wife, but refuses to do so, and takes the deed in his own name, he holds the land in trust for his wife, and a court of equity will, after the death of the husband, afford the proper relief to her as against his heirs.

2. SAME: SAME: *Case in judgment.*
Mrs. O. being the owner of a separate property, consisting of real and personal estate, it was agreed between her and her husband that she should purchase a certain tract of 240 acres of land for $3,000, and pay $1,500 in cash, and sell a small tract of land which she owned to raise money to meet the deferred payment of $1,500. Accordingly she handed to her husband the $1,500 in cash to consummate the purchase, which he did for her, but took the deed in his own name, and refused to convey to his wife. She then refused to sell her land to raise money to meet the deferred payment. O. thereupon sold eighty acres of the land so purchased by him for $1,600, and paid out the balance due on the 240 acres, and died soon thereafter. *Held,* that the trust was fully established by these facts, and that the widow is entitled to relief as against the heirs of her deceased husband.

3. SAME: SAME: *Delay. Abandonment.*
Where the claim to set up a resulting trust has been delayed for an unreasonable length of time, and the defendant sets this up as a defense, and claims that the complainant had abandoned the claim to the trust, it becomes a question of

intention on the part of the claimant, and testimony in explanation of the long delay and silence is admissible.

4. SAME: SAME: *Testimony of solicitor for complainant. When admissible. For what purpose. Case in judgment.*

Mrs. O., the widow of O., deceased, applied to S., her solicitor, to file a bill to set up for her a resulting trust in the lands to which her deceased husband held the legal title, and S. advised her to not file the bill, but to claim as the widow, which she attempted, and in which she litigated for several years, and then filed her bill to set up the trust. *Held,* that so far as the delay in the prosecution of the claim is a defense thereto, the evidence of S. is admissible in explanation of the reason of delay, but not as evidence of the claim itself.

APPEAL from the Chancery Court of *DeSoto* County.

Hon. J. F. SIMMONS, Chancellor.

The facts in this case are very fully set forth in the opinion of the court.

It is assigned for error:

1. The court below improperly excluded the testimony of the complainant, Mrs. House.

2. The court erred in dismissing the bill and refusing relief to complainant.

*Walter & Scruggs* and *G. E. Harris,* for appellants:

The bill states a case making a perfect resulting trust in the land. The testimony of complainant proves it beyond all doubt. This testimony was improperly suppressed. The case of Reinhardt *v.* Evans, 48 Miss., 230, is relied on to sustain this action of the chancellor. This case simply decided that no one can testify to establish his claim for a debt against an estate in a suit against the administrator. Both the old and new law contemplated claims for money against an administrator or executor. See Code, 1871, § 758. The administrator can bring no suit for the realty; complainant was not testifying to establish her claim against the "estate of a deceased person." Her contest is not with Osburn's administrator, but with Harden and others, who claim to be the owners of the land. Defendants were all of full age before this suit was brought, and no debts existed against the estate. She is not excluded by the act; she is a competent witness. Though a

party to the record, her testimony would not establish her claim against the estate.

But concede, for the argument only, that the decision on this point is correct, still there is proof enough in the record to conclusively establish the trust.

A copy of the chancellor's opinion is filed and referred to, and we may notice it.

Fogg proves clearly that appellant handed her husband $1,250 in gold, to pay for the land, on his solemn promise to take the deed in her name, and the acknowledgment of Osburn that he had used it for this purpose, and that the land was complainant's. There is no question about the clearness and fullness of this proof. Is it in any way impaired? For this we look in vain in the record. The chancellor says (rather sneeringly) that he concealed his relationship to appellant. The record shows nothing of this. The witness promptly and tersely answered the question the moment it was asked. Next the chancellor takes up the deposition of appellant (which he had just suppressed), and tries to show some discrepancies between appellant and the witnesses. They are trivial at best, and on the most unimportant points, and only prove that substantial truth is found in circumstantial variety. But we protest against the use of appellant's deposition as to some of her evidence against us, and yet exclude everything said in our favor. It either is, or is not, testimony.

The chancellor says Fogg is contradicted; that he was not living on his own land in 1858. Unfortunately for appellees, they file us an exhibit, the title bond dated November 18, 1858. This fixes the date of purchase of the land in controversy. It is said that he had sold, and before that time, and Moseley's deposition is referred to, and this is fatal to the chancellor's assault on the witness. It is true Moseley says he purchased the land March 17, 1858. When asked how he remembers the date, he says by the date of the note for the purchase money, which he makes a part of his deposition. There it is, sure

·enough, and its date is not March 17, 1858, but March 17, *1859*. He doubtless thought he was correct. The paper fixes his error, and sustains Fogg.

Jenkins says he heard Osburn say the land belonged to her. This was a clear admission in derogation of his title. 1 Greenl. on Ev., §109.

The witness, Lou Osburn, was the slave of Osburn. She says appellant, again and again, claimed the land, even in angry quarrels, and this seems to have laid the foundation for their separation.

The case is made out by clear and irrefragable testimony—a phrase so often used by the chancellor, in that singular document which reads more like a lawyer's brief than a chancellor's opinion. How is all this met? The deed of separation is referred to. It had been declared a nullity. See Stephens *v*. Osburn, 41 Miss., 119. This nullity is thrust in appellant's face to bar her claim. Be it so. Upon its face it shows unsettled matters between Osburn and wife, and binds him to turn over all property, even that held " *in trust*," to his wife ·on settlement. What trust property?

It is said that Osburn borrowed the money from Nichols to make the first payment. Nichols loaned Osburn $400; but alas again for appellees! this was December 3, 1858, long after the payment was made.

It is said that Osburn sold his land and paid for that in controversy. Unfortunate again; the payment was made for the land in controversy ·long before Osburn sold his land to ·O'Neil, and most of that went to pay Dandridge for the slave, Low.

The witness, Stokes, was competent, although counsel for ·complainant. He only shows the mental condition, the *status* ·of the complainant, and this, too, before the *lis mota*. The lapse of time before suit brought, any statement of complainant to rebut the idea of abandonment during this period, would be a part of the *res gestœ*, and is therefore admissible. 1 ·Greenl. on Ev., § 108, 109 ; 14 S. & R., 276 ; 8 Watts, 479 ; 11

Pick., 362 ; Starkie on Ev., 39–53 ; Gilliam v. Brown, 43 Miss., 641, is not in point. There the evidence offered was to explain an admission.

The judgment of the chancellor is only *prima facie* correct. If it is shown to be against the weight of evidence it will be reversed.

*White & Chalmers*, for appellees :

In July, 1857, complainant, then the widow of McGee, was married to Isaac Osburn, who was at the time a widower, with children, who are defendants in this suit. In 1858 Osburn purchased the land in controversy, taking first a title bond, then a deed in his own name. On February 5, 1859, the parties entered into articles of separation, duly executed, and remained separate.

Both parties having been possessed of some property, of about equal value, at the time of the marriage, a full settlement of all outstanding matters is provided for in the articles of separation, each relinquishing all further claim of every sort upon the property of the other. It is distinctly stated that the wife is indebted to the husband, on account of various antenuptial debts paid by him for her, and it is agreed that he shall be allowed to collect certain notes belonging to her (in his hands) to repay himself, and hand over the surplus to the trustee of J. P. Lewis.

No allusion is made to the land in controversy or the money advanced by her in purchase. Though it is now pretended that this land controversy was the cause of the separation, a theory, however, which is effectually disposed of by Dr. Brown's deposition.

Osburn died in January, 1866. H. S. Stephens administered on his estate ; sold his personal property ; reported sale, and Jane (appellant) came and claimed the exempt property as his widow. The articles of separation were pleaded in bar. The case went to the high court. See Stephens v. Osburn, 41 Miss., 119. She recovered the exempt property. Another contest arose between her and the heirs. Harden v. Osburn,

43 Miss., 532.   The court held that the exempt property belonged jointly to the widow and children of Osburn.

She had intermarried with one James H. House, and ceased to be the widow of Osburn.  As soon as the case in 43 Miss. was decided, the children of Osburn brought ejectment to recover the land.  She enjoined the ejectment suit, and set up a resulting trust in herself in the land.  She alleges that her husband purchased the land with her money, on express promise to take the title in her name ; that he violated his promise, and took the deed in his own name ; that she demanded a conveyance to her, which he refused.  They quarreled and separated in February, 1859.

This is the first time that such a claim had ever been heard by Osburn's children, or administrator, or the public at large.

Nearly *thirteen* years had elapsed since the purchase of the land, more than *twelve* years since the angry and final separation of the parties, and more than *five* years since her husband's death.  As already stated, she had had two law suits over his property ; she had known the exact condition of the legal title ever since the purchase.  The articles of separation, (believed to be valid by all parties) had been entered into, in which she asserted no claim.  She had seen her husband living in the actual adverse possession and control of the land for nearly *ten* years ; she had suffered the grave to close over him in silence ; for more than five years, she had exhausted every possible claim to his estate as his widow, and had lost it all by a second marriage, and when all was about to slip from her grasp she, for the first time, *trumps up* and propounds this most monstrous claim !

It is sought by the deposition of A. W. Stokes, the solicitor of complainant, to partially explain this long silence, by showing that she consulted him, and he advised her to claim as a widow, and not under her resulting trust.  This, if admitted, is at least but a poor and imperfect explanation.  But it is not admissible, and should have been suppressed.  It was the pri-

55

vate consultation of lawyer and client, and is unconnected with any other conversation or fact in the case. Brown v. Gillain, 43 Miss., 641.

The authorities all hold that, to support a resulting trust in lands, the testimony must be "clear, undoubted, satisfactory, irrefragable." The doctrine is an encroachment on the statute of frauds. It works a divestiture by parol of the title to realty, which has been deplored by the wisest judges——only acquiesced in because so long adhered to. Especially should the testimony be undoubted when the holder of the legal title is dead, and the claimant knew the condition of the title in the life-time of the deceased. As showing the strictness of proof required in making out a case of resulting trust, see 2 Coldw. (Tenn.); 14 Iowa, 326; 5 Porter (Ala.), 207; 7 Leigh (Va.), 566.

Does the testimony adduced by the complainant come up to the character, "clear, undoubted, and irrefragable proof?" Apart from her own deposition, it consists wholly and solely of that of her nephew, Fogg, and the witness, Jenkins, who testifies to hearing Osburn say, on one occasion, "it was her land." The remark was made to the carpenter, who was disputing with Mrs. Osburn as to where the house should be located. Surely, very slender proof! It was her land, so far as the carpenter was concerned; it was hers, and not his; she was to live in it, and not he (the carpenter). It was a mere casual remark made by Osburn to a stranger, at a time when the title to the land was not the subject of controversy or even of conversation. As to how little weight such admissions are entitled, see 2 Lead. Cas. in Eq., 183, and notes; 2 Johns. Ch., 405, 442; 1 Greenl. on Ev., § 200; Brown v. Gilliam, 43 Miss., 641. In the case last quoted, this court say "that a single, separate declaration, casually made, in loose, idle conversation, does not deserve much consideration."

As to the testimony of Fogg, if it was deemed wholly credible, and consistent with itself and the other proved facts in the case, it might make out the case. But it is incredible, inconsistent, disproved by other witnesses and facts in the

case, and, in point of fact, untrue, and so the chancellor found. The opinion of the chancellor has frequently been likened by this court to the verdict of a jury, and there is no point upon which the verdict of a jury is so conclusive as upon the credibility of a witness.

The deposition of complainant was properly excluded. See Code of 1871, §§ 156, 758; Reinhardt v. Evans, 48 Miss., 230; Wetherspoon v. Blewett, 47 Miss., 570.

TARBELL, J., delivered the opinion of the court.

This proceeding was instituted to enjoin a suit at law and to establish a resulting trust. The substance of the bill is as follows: Jane J. House, one of the complainants, previous to her intermarriage with her co-complainant, James House, was the second wife and widow of Isaac Osburn, deceased, whose children and heirs by a prior marriage are defendants herein; she intermarried with Osburn in 1857, she being at the time a widow, and owning in her own right several negroes, a considerable amount of money and stock, and two tracts of land. Osburn was a man of limited means, owning a small tract of land, and engaged chiefly in stock-raising. In November, 1858, he sold his tract of land and invested the proceeds in a negro woman. It was agreed between them—complainant Jane and Osburn, then husband and wife—that she would purchase, out of her own means, 240 acres of land of William Sloan, and invest $1,500 of her own money on the first payment, and sell part of another tract of her land for $1,500, wherewith to meet the balance of purchase money to Sloan; Osburn agreeing that the title to said 240 acres should be taken to his wife, complainant Jane. With this understanding she paid over to her husband, said Osburn, in November, 1858, $1,250 in gold, and furnished him with $250 more in paper money. Osburn, however, took title to himself. She then refused to sell any part of her other lands until title to the 240 acres should be made to her. Differences growing out of these transactions resulted in the separation of the complainant

Jane and her said husband, Osburn. If title to said land was to her, she was ready and willing to pay the balance on the same; but he always refused, and afterwards sold eighty acres of the 240 acres for $1,600, to pay out the purchase of the latter. Afterwards she moved onto the said land, giving notice to the administrator of Osburn, deceased, and to a large number of persons present at the administrator's sale of personal property of said deceased. She has notoriously proclaimed these facts ever since she parted from her said husband. Defendants are all non-residents, but they have all the time had an agent here, who knew that complainant Jane was in open adverse possession of said land, and paying taxes thereon; yet they made no demand upon her for the possession of the same, or the rent thereof, until 1871, when a suit of ejectment was instituted by defendants, against complainants, for the lands involved herein, they claiming as heirs of Isaac Osburn, by virtue of the legal title to the same which he obtained by defrauding complainant Jane of her rights therein. Complainant claims the land involved, in view of her investment of $1,500 therein, as set forth in this bill; avers that the eighty acres sold by Osburn was worth as much as the land now remaining, and, to give her a fair proportion for the money she paid in, will require every acre sued for; prays for perpetual injunction of the suit at law, for an account to ascertain the real value of the lands purchased as aforesaid, the amount paid thereon by complainant Jane, the true value of the land now sued for, and that, to so much thereof as her money amounted to, the legal title be now divested out of defendants and vested in complainant Jane.

The answer denies the payment of any money for the lands herein, as averred in the bill; denies the allegation of an agreement that title was to be taken to complainant Jane; denies that the separation of complainant Jane and Isaac Osburn was for the reasons assigned in the bill; avers that complainant Jane was indebted to said Isaac Osburn, and sets up the deed of separation between them; avers that Osburn died July 1,

1866, and that complainant Jane took possession of said lands in the fall of that year or early in 1867 ; sets up the litigation which followed between said Jane and defendants herein, as to her rights in the real and personal property of the deceased, under the exemption laws of the state, as reported in 43 Miss., 532 ; avers that at the conclusion of that litigation the action of ejectment hereby enjoined was instituted, etc.

Upon the bill, answer, exhibits, and proofs the chancellor rendered a final decree dismissing the bill and dissolving the injunction. From that decree the complainants prosecuted this appeal, and assign for error the action of the court in suppressing the deposition of complainant Jane, and in rendering said decree.

There is filed with the papers a written stipulation of counsel, that a motion was made to suppress the deposition of A. W. Stokes, which motion was left undecided by the chancellor. There is nothing in the record showing that such a motion was made.

The substance of the evidence, omitting that of complainant Jane, in the order in which the depositions are contained in the record, is as follows :

William Sloan testifies to the sale of the 240 acres of land described herein, for $3,000, of which Osburn paid him $1,250 in gold, and deed was made direct to Osburn ; the eighty acres sold by Osburn were worth as much as the remaining quarter now in controversy ; he sold the eighty acres to T. W. White for $1,600 ; witness sold to Osburn after he sold his place to Nail.

M. S. Fogg testified that in the fall of 1858 he was at Osburn's house ; saw Mrs. Osburn (complainant Jane) pay over to her husband (Isaac Osburn) $1,250, which he agreed to pay on the land in controversy and to take the deed in her name, she telling him at the time that if he did not do so he should not have the money ; he told her he would bring back the deed in her name ; he started very soon afterwards—perhaps

next day—to pay for the land ; the money was in gold ; witness counted the money at the request of Mrs. Osburn, for which purpose he was at her house by her request ; Mrs. Osburn owned, at the time, a quarter-section of land, which she agreed to sell to witness for $1,500, if Mr. Osburn, would deed her the tract bought of Sloan ; but she refused to complete the trade to witness unless Mr. Osburn had the Sloan tract deeded to her ; Osburn and wife both said if witness got the land of Mrs. Osburn the purchase money was to go to pay out the purchase of Sloan ; Mr. Osburn told witness he sold a mare belonging to Mrs. Osburn for $150, and applied the money towards the Sloan purchase ; Osburn and wife separated soon after the above land transaction ; Mr. Osburn told me, after the separation, that the land stood good to Mrs. Osburn for her money.

L. A. Jenkins testified that he was at one time assisting in laying the foundation of a new house on the land in controversy ; Mr. Hargroves and Mrs. Osburn disagreed as to the location of the house ; Mr. Osburn said to Hargroves to let her have her own way, as the land was hers anyhow, and the foundation was laid as she directed.

James Humphreys testified that he knew Osburn to get a fine yoke of steers from Mrs. Osburn ; also a bale of cotton, for which Mr. Osburn said his wife would kill him, but he intended to take it anyhow ; he wore clothing made by her, which he said she presented to him.

Sterling C. White testified as to the separate estate and resources of Mrs. Osburn.

I. Y. Coffey testified as to the character, habits, property, and means of Mrs. Osburn.

P. Brown testified that he was a witness to the deed of separation between Osburn and wife ; heard a settlement of money matters between them ; heard no claim by her to the land in controversy, then nor afterwards ; never heard either of them speak of the money in the land, and never knew any-

thing about the purchase of the land; never knew or heard of any disagreement until he heard of the separation; was a physician, and lived some miles away.

G. W. Nail testified that he bought a tract of land of Isaac Osburn in 1858; paid $10 in gold, and gave his note for $990, which he paid January 3, 1859; never paid balance. (This note is filed, and appears, by indorsement, to have been paid to one Dandridge, for a slave named Lou Osburn, July 3, 1859.)

Lou Osburn, former slave of Isaac Osburn, testified that Osburn bought her a few months after he married complainant Jane; heard disputes between Osburn and his wife about this land; she claimed that her money paid for it; he called her a liar.

F. Labaun testified that in 1858 he got a note, dated December 3, 1858, for $400, made by Isaac Osburn, payable to J. D. Nichols. (This note Osburn took up by giving witness a note on G. W. Nail, part of purchase money of land sold him by Osburn.) Witness and I. W. White bought the land known as the Fogg place in August, 1857, and sold it to Moseley & Whitley in March, 1858.

I. W. White testified that on 24th February, 1860, he purchased from Isaac Osburn eighty acres land for $1,600; one-half cash, one-half in note, which went to Sloan or Butler, from whom the land was purchased shortly after the war.

J. D. Nichols testified as to the property and means of Isaac Osburn, and to loaning Osburn $400 December 3, 1858.

John T. Moseley testified that Moseley & Whitley purchased the land known as the Fogg place March 17, 1858, and refers to the note filed as an exhibit. (The note referred to and made an exhibit bears date March 17, 1859.)

A. W. Stokes testified that complainant J. J. House, then J. J. Osburn, came to him in 1860, after Osburn's death, to counsel him, as attorney, as to her rights as widow of Osburn; at that time she set up the same claim she sets up in the bill now before the court; witness advised her to take possession under the homestead exemption acts, and contend for the share

of the personalty that was exempt; after the conclusion of the controversy then inaugurated she again insisted on setting up her right to the land because her money paid for it, as she did at our first interview.

The witnesses giving the direct and positive testimony referred to are unimpeached, and presumably unimpeachable. Their evidence is assailed only upon the ground of alleged discrepancies. These supposed discrepancies are upon immaterial and unimportant facts, but will be noticed.

The witness Fogg, in his testimony, says that in 1858, when called in to count the gold for Mrs. Osburn, he was living on his own land, in the same section and adjoining the land of Osburn, the same now in controversy. Two or three witnesses state that Fogg could not have lived adjoining the Osburns, in the fall of 1858, for they say he moved away from that place some months, if not a year, prior to the time fixed by him as living there and being called in by Mrs. Osburn, and this is claimed as a serious objection to the value of the testimony of the witness. In support of these witnesses exhibits are filed, but the dates given in the exhibits prove Fogg to be correct, and the others wrong, as to dates. On the part of defendants there was an attempt to show two special sources whence Osburn derived money wherewith he might have made Sloan the first payment on the land involved. One, the note of G. W. Nail of $990, for land sold him by Osburn; but this note went to pay for the slave girl, Lou Osburn. Osburn borrowed $400 of Nichols, but this was in December, and the trade with Sloan was in November.

Fogg, in his testimony, makes a contract with Osburn and wife to sell him a tract of land a part of the arrangement on their part to buy the land in controversy. This is urged to be untrue, and an after-thought of the witness. An exhibit shows the date of the unexecuted contract of sale by Osburn and wife to Fogg to have been on November 15, 1858. This was just about the date of the purchase from Sloan, as nearly as

·can be ascertained from the record, and is construed as corroborative of the evidence of Fogg.

It is said there is no evidence of any other sum of money advanced by Mrs. Osburn to Mr. Osburn than the $1,250 in gold ; whereas she avers, in her bill, to have advanced him $1,500 " in the presence of witnesses now living." The complainant Jane and the witness Fogg are assailed, as in conflict in their statements. She does not charge that she delivered the $1,500 in the presence of Fogg. He testifies to the delivery of the $1,250 in gold. No discrepancy or conflict is perceived in this. As to other money than the gold, the witness Humphreys testifies to a yoke of oxen and a bale of cotton, the property of Mrs. Osburn, appropriated by Mr. Osburn. The oxen were valued at $150, and the bale of cotton could not have been worth less than $100, and was doubtless worth much more than that sum. The witness Fogg proves the delivery of $1,250, and the witness Humphreys at least $250, making $1,500, the sum charged. And, in addition to this, Fogg testifies to the sale by Osburn of a mare belonging to Mrs. Osburn, valued at $150.

A rigid inquiry was made into the habits, character, property, resources, and means of both Osburn and wife, resulting only in showing each to have had small tracts of land, with horses, cattle, hogs, sheep, and a negro or two, and each to have been industrious, money-making and money-loving, and, probably, self-willed. This evidence is, on the whole, creditable rather than otherwise, but is not in other respects material.

Counsel for appellees, in the argument, say : " As to the testimony of complainant's nephew, M. S. Fogg, we will only remark that, if deemed wholly credible and consistent with itself and the proved facts in the case, it might be considered sufficient to make out complainant's case." A discussion of the evidence of this witness is waived by counsel, and its analysis by the chancellor is referred to, on whose opinion counsel rely as upon the verdict of a jury.

The points of discrepancy indicated in the opinion of the chancellor have been carefully tested by the record, and already noticed. In these particulars the chancellor clearly erred in his comparison of the facts. The exhibits sustain the evidence of Fogg, and prove the witnesses who differed with him as to dates to have been wrong.

Three other points relied upon by the defendants demand some notice. The delay in the assertion of this claim in the courts is urgently pressed, as casting strong doubts and suspicions over it. Since the death of Mr. Osburn the complainant Jane has been in almost constant litigation in the courts with the representatives of deceased (see Stephenson v. Osburn, 41 Miss., 119; Hardin et al. v. Osburn, 43 ib., 532), during all which period the complainant Jane has repeatedly and constantly asserted the right now set up. Upon the commencement of the action of ejectment against her by the present defendants this proceeding was instituted. She was in the open and full possession of the land involved, from the fall and winter of 1866–67 to 1871, before the action of ejectment was instituted against her by the heirs of deceased.

The deed of separation between Osburn and wife (complainant Jane) is relied upon. This was declared void in Stephenson v. Osburn, 41 Miss., 119, and certainly cannot now constitute a valid defense to the present claim, if otherwise made out. But, by the express terms of the deed of separation, Osburn relinquished to his wife all claim to her property, real and personal, "which he may now or hereafter have in law or equity." If valid and binding, he thus transferred to her all property of hers held in trust by him, embracing the present claim, if it existed. However, the deed of separation is understood to be offered as an admission, or waiver, on her part. The settlement, so-called, between Mr. and Mrs. Osburn was a nullity. The argument, then, is that the deed, declared a nullity by the appellate court, and the settlement under that deed between the parties thereto—also a nullity—can be interposed as a valid obstacle to a recovery

in the pending proceeding.    This will hardly do.    If the deed and settlement thereunder are valid and available for any purpose, they must be so for all.    Being utterly void, they must be wholly disregarded.    With reference to this deed and settlement, however, an explanation is found in a statement of Osburn to Fogg, "that the land stood good to her for her money."

The evidence of A. W. Stokes was objected to as incompetent, but the ground of its incompetency is not stated.    The declarations of complainant to him are not understood to be offered as evidence of her claim, but only as an explanation of delay in its enforcement, which is invoked against her.    The witness Lou Osburn testified to its repeated assertion while Osburn and complainant Jane were living together.    According to Mr. Stokes, she asserted it to him, but deferred its legal enforcement on his advice.    In Gilliam v. Brown, 43 Miss., 641, it was sought to make the declarations of the party to counsel available as positive evidence of the claim, by way of rebutting a direct admission.    In the case at bar the admission, if any, is rather by silence, and is a matter of inference or argument.    The doubt cast upon the claim of complainant by her delay to institute legal proceedings for its enforcement being invoked, she explains by showing that she declared her right to counsel, and asked him to institute an action, but he advised delay and litigation on other grounds.

The ruling in Young v. Power, 41 Miss., 197, will be better understood by quoting from the opinion of the court: "It appears from the evidence that the deductions of the testatrix, which are relied on as a forgiving of the debt due her by the defendant, were altogether gratuitous, and that the promise was without valuable consideration, and that the forgiving, *in terms*, was not complete and absolute, but that some further act was requisite to consummate it.    The matter, therefore, rested in her discretion, and depended on her mere volition. It was a question of intention on her part; and, as the promise remained unexecuted, it was clearly proper to show what her

:876      House et al. vs. Harden et al.      [Sup. Ct.

Opinion of the court.

intention was, and her declarations on that point were competent evidence." 1 Greenl. on Ev., § 108, is cited, which treats of declarations as a part of the *res gestæ*. The succeeding paragraph of the opinion to that above quoted affords a key, as is believed, to the solution of the point under consideration, viz. : " If the ground of defense relied on was competent, this testimony, which had a direct bearing on it, was also competent, and should have been admitted." So far, therefore, as the delay in the prosecution of the claim herein is a defense thereto, the evidence of Stokes is admissible in explanation of the reason of delay, but not as evidence of the claim itself.

The delay in the institution of legal proceedings for the establishment of the trust set up herein ought, perhaps, to be considered.

The evidence shows that the separation caused Mrs. Osburn to be a " good deal excited and troubled." Dr. Brown was expecting Osburn and wife to move to his neighborhood to live on a place of theirs, when one evening Mrs. Osburn rode up alone and told him " her and Osburn had parted ;" that they " had quarreled a great many times, and had nicks and passes." A few days after Mr. Osburn himself came up to the neighborhood—Mrs. Osburn then living there.

It also appears that Osburn and wife, from the period of separation to the death of the former, interchanged visits at the abode of each. She made and presented him with wearing apparel of her own manufacture and make, and she attended him in his last sickness.

These items of evidence are unnoticed, either by the chancellor or counsel, but they are believed to possess peculiar significance.

The death of Osburn occurred just on the eve of the war, during which the courts were measurably closed, and litigation to a great extent suspended. This may or may not have had its influence upon the action of Mrs. Osburn.

Upon the death of Mr. Osburn litigation instantly began, and

has been continuous from that time to this, the particular claim under consideration being delayed, on the advice of counsel, to await the result of other suits.

Thus the trust involved is established beyond all reasonable doubt.   Indeed, any other result would do violence to the evidence, to reason, and to justice, as the case is presented by the record before us.   In rendering the final decree, therefore, the chancellor clearly erred.   And this result is reached without reference to the evidence of complainant.   Such being the case, the competency of her testimony, under the Code, § 758, will not be considered.   Her testimony was offered in support of her claim to a resulting trust in real estate, the legal title to which was held by her late husband, since dead, the same having been purchased by him with her money.   Code, § 1779.

Decree reversed, and decree here enjoining the suit at law, and further decree declaring trust title in complainant Jane H.