**BEVERING et al. v. SMITH et al.**
(No. 9933.)

(Court of Civil Appeals of Texas. Fort Worth. April 8, 1922.)

Contracts ⬅️140—Fraud in overvaluation of property in organizing corporation held not to affect validity of renewal note for purchase of interest.

Fraud in overvaluation of property, transferred to a corporation for its capital stock on its organization, does not affect the validity of a note in renewal of note given to owners of capital by purchasers of a portion thereof, in payment therefor.

Appeal from District Court, Clay County; John P. Marrs, Special Judge.

Action by A. H. Bevering and others against J. Fred Smith and others. From a judgment for defendants, plaintiffs appeal. Judgment reversed and rendered.

Carrigan Montgomery, Britain & Morgan, of Wichita Falls, and Wantland & Dickey, of Henrietta, for appellants.

R. E. Taylor, of Fort Worth, and Kay, Akin & •Kenley, of Wichita Falls, for appellees.

BUCK, J. A. H. Bevering and M. L. Hooker, hereinafter styled appellants, sued J. Fred Smith, Harry Pennington, and Ross Corlett, hereinafter styled appellees, on a joint and several promissory note,. executed by appellees on July 10, 1919, in the sum of $26,037.35. It was alleged that said note was long past due and had not been paid, except $1,500 thereon. Appellees answered by a general demurrer, a general denial, and specially pleaded that the appellants and the appellees agreed among themselves to promote, organize, and have incorporated, under the laws of the state, a company for the purpose of prospecting, "wild-catting," exploiting and developing oil and kindred minerals in the state of Texas; that said company should be incorporated for $150,000, with the capital stock divided into 1,500 shares of the par value of $100 each; that, after the procuring of the charter,. said company would then sell a large part of the shares of the stock to the public in general, and from the proceeds of the sale thereof the appellants and appellees would pay promotion fees, expenses, and with the remainder prospect for oil on lands in Clay county, Tex.; that, on February 21, 1919, the application for said charter was approved and the charter issued in the name of Industrial Oil Company, with an authorized capital stock of $150,000, divided as proposed; that A. H. Bevering was elected president of the corporation and has since said time continuously acted as president thereof; that, on April 8, 1919, the appellants represented to the appellees that it was necessary, for the further promotion and proper carrying on of the business of said company, that the appellees execute their joint promissory note for $25,860, payable on June 15, 1919, and that they did execute said note and delivered it to the appellants.

They further pleaded that it was further agreed that said note would be paid out of the net proceeds of the first sales of the capital stock of said corporation, and that the appellees would not have to pay the same personally or be personally liable thereon; that, subsequently, on July 10, 1919, the appellants represented to the appellees that it

was necessary for them to issue another note in renewal of first-described note, and they did so execute their note in an amount to cover the principal and accrued interest; that this last-named note was the one sued on. They further pleaded that nothing further was done towards financing or doing any business under said corporation, and that said promotion and formation and organization of said corporation was in violation of the laws of the state of Texas, in that the appellants owned leases in Clay county, which they and the appellees agreed were reasonably worth $43,100, and that these leases were valued by the appellants and appellees at $150,000, and were the only property or funds furnished by any one towards the capital stock of the corporation; that said valuation of the leases at $150,000 was a fraud upon the state of Texas and the public generally, and that the Secretary of State's reliance on the truth of said valuation induced him to issue the charter; that the excess valuation of the leases was fraudulent, and affected the whole transaction as between the appellants and appellees; that hence appellees were not liable on the note executed in the alleged furtherance of this fraudulent scheme. It was further alleged that said note was an accommodation note and without consideration, and that the appellees had never received any stock in the corporation, and had received nothing for said note so executed. The appellants filed a supplemental petition, among other things containing a general denial of the allegations of the answers of the appellees.

The cause was tried before the court without a jury, and the court entered judgment for the defendants, and the plaintiffs have appealed.

The trial court filed findings of fact and conclusions of law, and, without attempting to set out the same in full, we will give the substance thereof. The court found:

(1) That, in the month of January, 1919, during the oil boom in and around Wichita county, the appellants were the owners of 702 acres of oil leases in Clay county, which they desired to sell or have bored for oil and gas. That there were several wells being bored for oil and gas in the vicinity of their holdings. That the appellees were all oil men and drilling contractors, with more or less experience in drilling oil and gas wells, and that it was agreed, between appellants and appellees, that they should organize and have incorporated a company with a capital stock of $150,000, and that said 702 acres of the leases belonging to appellant should be conveyed by them to the company, and that they would value the same at $150,000. That they did so, although they all knew that the valuation given in the application for the charter was grossly excessive. That the Secretary of State relied on the truth of such valuation.

(2) That attached to said application for charter was an affidavit signed and sworn to by the parties to this suit, which shows that each of them had subscribed for and paid $30,000 towards the capital stock of the corporation, and that said subscriptions were paid by conveying to the company 702 acres of oil and gas leases, alleged to be worth $150,000. That appellants and appellees were elected directors of said corporation, and that the directors subsequently elected A. H. Bevering president, Harry Pennington vice president, and Ross Corlett secretary and treasurer.

(3) That all of the stock certificates were signed in blank by the president and left in the stock book, and were to be filled in and delivered to the subscribers as they called for them, or to be filled in and delivered to any other person who might purchase them. That any of the subscribers could have secured their stock certificates at any time, by calling upon the secretary for them, but none called for their certificates except some outside purchasers, who bought stock in the company to the amount of $2,800, but, when it was found that the promoters could not sell sufficient stock to develop the lands and complete the plans of the company, the money so paid by these outside purchasers was returned to them, and the certificates of stock were delivered by the purchasers to the company. That neither the corporation nor any of the promoters ever made any attempt to comply with what is known as the "Blue Sky Law," in Texas, and that none of the promoters seemed to know anything about such law. That all of the promoters acted as officers and agents of such corporation and as stockholders thereof. That, on April 8, 1919, the promoters held a meeting to discuss the affairs of the company and found that very little of the stock had been sold and that, since the appellants were carrying all of the risk incident to the corporation, it would be right and proper that the appellees should execute and deliver to the appellants their promissory note for three-fifths of the $43,100, the agreed value of the leases conveyed to the company by appellants, and that appellees did so execute their note for $25,860, and that the note sued on in this case was a renewal of the first note mentioned. That said note was not an accommodation note and was not made on any agreed condition, but that the same was a promise on the part of the appellees to pay the appellants the amount of money therein specified, and that the same was in payment for their respective shares or interest in said company. That said note had never been paid, except the $1,500 credited thereon, as shown in appellants' petition.

(4) That no agreement of understanding between the parties was made that the certificates for shares or interest in the capital stock of said corporation were not to be ex-

ecuted or delivered until the note given to the appellants by appellees was paid, but that the appellees could have secured their certificates of stock at any time by applying for same. That the appellees participated in the corporation as shareholders and directors, with the full knowledge and consent of the appellants. That the developments, in the neighborhood where said land was located, during the spring and summer of 1919 showed that the land was not oil and gas bearing and that the leases became of little or no value, and that, some time subsequently to July, 1919, the entire project was abandoned, but that said oil and gas leases were never retransferred to A. H. Bevering or M. L. Hooker. That, on account of the failure to pay the franchise tax, the charter of said corporation was forfeited on July 2, 1920.

(5) That nothing was paid for the capital stock of said corporation, except the conveyance of the oil and gas leases on the 702 acres of land hereinbefore referred to. That all expenses incident to the formation or organization of the corporation were paid jointly and equally by the appellants and the appellees, out of their personal funds. That the reasonable market value of the leases on the 702 acres of land, at the time the same was conveyed to the company by the appellants, was not in excess of $43,100, the leases, made in the application and affidavit for the charter, were untrue and known to be untrue by the five promoters, and that the same was thus falsely stated in order to secure the charter for their company with a capitalization of $150,000, so that they could collect enough money from the stock-buying public to pay the appellants for their leases, and the appellees a good price for their drilling, and make a handsome profit in promotion fees, whether any oil or gas was ever found on their wild cat leases or not. That there was no definite understanding or agreement among the promoters as to how much stock or what stock or whose stock would be sold to the public, but that the five promoters were to share equally in whatever of stock or money was left after appellants were paid for their leases, and the appellees for their drilling, and the other expenses incident to the organization were paid. That, subsequently to July 10, 1919, the promoters being unable to sell the capital stock of said company, or very little of it, to the general public, abandoned the project, and that said corporation, at the time of the filing of this suit, was defunct and is still defunct. That the assets of said corporation, at the time of the trial, were of no value, and that the company owes no debts.

(6) That the only part of the capital stock actually paid in was paid by the appellants by the conveyance of the 702 acres of oil and gas leases aforesaid, and that appellees have paid no part thereof except the $1,500 paid to appellants by appellee Smith. That the parties forming said corporation did not, in good faith, subscribe the full amount of its authorized capital stock and did not pay 50 per cent. thereof before said corporation was chartered. That the note sued on in this case, as well as the original note, for which it was given in renewal, in so far as the same purports to be a joint obligation of the makers, is without consideration, and that the liability of the appellees thereof, if any, is several as to each of them and not joint.

From the above findings, the court concluded that the attempted sale of shares of stock of said corporation was illegal, a fraud upon the state of Texas, and a fraud and attempted fraud upon the public, and against public policy, and that the note declared on is tainted with such fraud, and that the court should refuse to grant any relief to either appellants or appellees. This last conclusion was in answer to appellee Smith's plea in reconvention for the recovery of the $1,500 paid by him.

For the purpose of this opinion, we will consider the findings of fact by the court as substantially reflecting the evidence in the case, although appellants have several assignments attacking certain findings, such as the finding that, through the fraud of the promoters, the Secretary of State was induced to issue the charter of the corporation. They allege that the Secretary of State sent a special investigator to Clay county, and that he issued the charter upon the report made by said investigator. Undoubtedly, the Secretary of State relied, in part at least, upon the truth of the facts stated in the affidavit made by the promoters in their application.

It is admitted by appellants that the leases conveyed to the company were not reasonably worth $150,000, but they urge that, inasmuch as it was contemplated by the promoters that two wells were to be drilled on the leased land, and to be paid for out of the funds derived from the sale of the stock of the company, that, in reality, no fraud was contemplated against the state or the public, as represented by the purchasers of the stock. But we do not find it necessary to discuss further such matters.

"If an act in violation of the law is already committed, a subsequent agreement, which, though founded thereon, constitutes no part of the original inducement or consideration for the illegal act, is valid. The distinction between a void and a valid new contract, in relation to the subject-matter of a former illegal one, depends upon the fact whether the new contract seeks to carry out or enforce any of the unexecuted provisions of the former contract, or whether it is based upon a moral obligation growing out of the execution of an agreement which could not be enforced by law, and upon the performance of which the law will raise no implied promise." 6 R. C. L., p. 699, § 104.

In Martin v. Richardson, 94 Ky. 183, 21 S. W. 1039, 14 Ky. Law Rep. 847, 19 L. R. A. 692, 42 Am. St. Rep. 353, the court held that a plaintiff could recover from defendant the value of a prize won on a lottery ticket which plaintiff alleged he had been induced to surrender to defendant by means of false and fraudulent statements made by defendant. The court said:

"This is not an action on a contract of sale or purchase of a lottery ticket. The transaction out of which the suit springs, and which forms its sole basis, is subsequent to any alleged illegal act, and wholly disconnected with it. In Armstrong v. Toler, 11 Wheat. 258, Chief Justice Marshall approved the opinion of the lower court, which was to the effect 'that a new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful.' ·And Toler was allowed to recover of Armstrong money which he had paid for Armstrong on account of goods known by both parties to have been imported contrary to law. In Catts v. Phalen, 2 How. 376, Catts was employed to draw out the tickets. He had a confederate to buy a certain ticket, and, before inserting his hand in the lottery wheel, he concealed in the cuff of his coat certain false and fraudulent tickets, which he managed to slip between his fingers, and then, drawing out his hand, produced the false ticket. When sued for the money received on the tickets so procured, he relied on the admitted illegality of the lottery drawing. The Supreme Court said: 'Phalen & Morris had in their possession $12,500, either in their own right or as trustees for others interested in the lottery. No matter which, the legal right to this sum was in them. The defendant claimed and received it, by false and fraudulent pretenses, as morally criminal as by larceny, forgery or perjury; and the only question before us is whether he can retain it by any principle or rule of law.' 'To state,' says the court, 'is to decide such a case.' 'The principle of illegal contracts is' (See Story on Conflict of Laws, §§ 248, 249), 'after the illegal act is done, if the new contract is wholly unconnected with the illegal act, and is founded on a new consideration, and is not a part of the original scheme, although it may be known to the party with whom the contract is made, it will make no difference that such new and independent contracts are made with the person who is the contractor or conductor of the original illegal act, if it is wholly disconnected therefrom.' So in Story on Contracts, § 760, it is said: 'If an act in violation of either statute or common law be already committed, and a subsequent agreement entered into, which, though founded thereupon, constituted no part of the original inducement or consideration of the illegal act, such an agreement is valid.' "

See, also, 6 R. C. L. p. 821, § 217.

In Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787, the Supreme Court had before it a suit by Patterson against Floyd & Co. The evidence showed that plaintiff had given to the agent of Floyd & Co., $7,000, to invest in futures; that subsequently Floyd & Co. sent to the agent $7,625, to be delivered to plaintiff, $625 being plaintiff's profit on the transaction. The agent failed to deliver the full amount to plaintiff, and the latter sued both the agent and principal for such balance. The Supreme Court said:

"It is well settled that a contract for the future delivery of stocks, produce, or other merchandise, in which an actual delivery is not contemplated but only a payment of the difference between the contract price and the value of the article at the time agreed upon as the date of delivery, is a mere wagering contract, which will not support an action. But, if the transaction has been completed and another grows out of it collateral to it, dependent upon a new consideration, the new contract is not vitiated by the taint of the old one, and will be enforced. 'It has been observed that the test whether a demand connected with an illegal act can be enforced is whether the plaintiff requires any aid from the illegal transaction to establish his case.' Gilliam, Ex'r, v. Brown, 43 Miss. 641, citing Simpson v. Bliss, 2 Taunt. 246; Roby v. West, 4 N. H. 290. It is accordingly held that, when one as agent of another has received money growing out of an illegal contract, he can be made to pay it over at the suit of his principal. In the case above cited (Gilliam, Ex'r, v. Brown) the testator of the defendant, as the agent of the plaintiff, took the latter's cotton to Memphis during the war and sold it there, 'as was conceded, in violation of law, and received the proceeds. The plaintiff was held entitled to recover. In Beetson v. Beetson, Law. Rep., 1 Ex. Dep. 13, the court held · that the plaintiff could recover on a check given by the defendant to plaintiff, for moneys received by defendant for winnings on bets made by defendant with third persons, as agent of plaintiff. In Owen v. Davis, 1 Bailey, 315, the defendant received a note in settlement of the joint winnings of a plaintiff and himself at cards. He transferred the note in payment of a gambling debt of his own to a third party, who received payment of the maker at a discount. The plaintiff was held entitled to recover one-half of the amount which was actually paid by the maker of the note. In these cases and in many similar ones, which need not be cited, it is held that the cause of action is not dependent upon the illegal transaction. When the plaintiff shows that the defendant has received of a third party money for his use, the law from the naked fact implying a promise, the case is made out without going into the illegal transaction, and the defendant will not be permitted to set up the illegality of the original contract, in order to defeat a recovery. So far the rule seems to be generally concurred in, and the principle of the rule is intelligible."

This case announces a well-established rule of law, and has been followed by a number of decision of our courts. Heidenheimer v. Beer (Tex. Civ. App.) 155 S. W. 352, writ refused; Hall v. Edwards (Tex. Civ. App.) 194 S. W. 675; Rousseau v. Everett (Tex. Civ. App.) 209 S. W. 460; Oliphant v. Markham,

79 Tex. 543, 15 S. W. 569, 23 Am. St. Rep. 363.

Appellants and appellees, in their respective briefs, discuss a number of questions involving the issue of whether or not there was fraud practiced by the appellants, and joined in by the appellees, in the application for the charter, and whether such fraud would invalidate the note sued on here, and each side cites a number of authorities bearing on the questions so discussed, but, in our opinion, it does not appear that any fraud, practiced by the parties to this suit in securing the charter for the corporation, has any necessary relevancy to the question of appellees' liability or not, under their contract to pay appellants the amount of money mentioned in the promissory note. There is no occasion for a reference to any alleged overvaluation of the property deeded to the company and valued at $150,000. Appellants were only required to introduce their note in order to prove their cause of action. It is conceded by appellees here, and found by the court, that the note was given in payment to the appellants for three-fifths of the agreed valuation of the property, which had been conveyed to the company and was owned by the appellants at that time. The court found that the execution of these notes was voluntarily done by the appellees, and that, by reason thereof, they became jointly and severally liable, unless, as further found by the court, such contract is void by reason of being tainted with the fraud in the overvaluation of the property conveyed to the company. We do not believe that the question of overvaluation of the leases is in any way so closely involved with the question of the liability of the appellees on the note sued on as to make the contract involved in the execution of the note invalid. Hence we conclude that the trial court erred in dismissing the cause, and for that reason the judgment below must be reversed. It further appearing that the facts in this case were fully developed in the trial below, and that the evidence shows that the defendants below were liable for the face value of the note, less $1,500 paid by appellee J. Fred Smith, together with interest and attorneys' fees, judgment is here rendered that said appellants have judgment for said amount against the defendants jointly and severally.

Judgment reversed and here rendered.